496 F.2d 832
 Fed. Sec. L. Rep. P 94,535
William J. HARNETT, Appellant in No. 73-1790,
v.
RYAN HOMES, INC., a corporation and Edward M. Ryan.
Appeal of Edward M. RYAN, in No. 73-1714.
 Nos. 73-1714, 73-1790.
 United States Court of Appeals, Third Circuit.
 Argued Feb. 12, 1974.
Decided April 29, 1974.
 
 J. N. Poffinberger, Jr., Michael C. McLean, David L. McClenahan, Robert B. Sommer, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for William J. Harnett.
 Leonard Boreman, Harold Gondelman, Baskin, Boreman, Wilner, Sachs, Gondelman & Craig, Pittsburgh, Pa., for Ryan Homes, Inc. and Edward M. Ryan.
 Before VAN DUSEN and ADAMS, Circuit Judges, and HUYETT, District judge.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 The principle issue presented by this case relates to the operation of the inveterate legal concepts of materiality and reliance in the context of a suit under Section 10(b) of the Securities and Exchange Act of 1934[1] and Rule 10b-5 of the Securities and Exchange Commission.[2]
 
 
 2
 This action was brought by William H. Harnett, a former shareholder-employee of a closely-held corporation, Ryan Homes, Inc., against Edward Ryan, the chief officer and majority shareholder of the corporation, and the corporation. The purported transgressions prompting this litigation emerge from the business and financial relationship between top personnel of this ostensibly prosperous enterprise. The company was engaged in home building, sales and land development, an industry, during the years relevant here, subjected to both favorable and not-so favorable economic winds.
 
 
 3
 Harnett became an employee of Ryan Homes, Inc. in 1961. His skills impressed Edward Ryan and Harnett made quick advancement. By 1965, he had attained the position of Vice-President of Marketing, and was a member of the Operating Committee.
 
 
 4
 During his tenure with Ryan Homes, Harnett acquired 1000 shares in the corporation. Resale of employee stock in Ryan Homes was governed by an agreement between Ryan Homes and its employees, including Harnett, which required 'that when a stockholder left the employ of the company that he sell his shares back to the company at a price equal to their book value' at the end of the quarter preceding the sale.[3]
 
 
 5
 In 1963 or early 1964, Edward Ryan began to investigate the possibility of developing a tract of land near St. Charles City, Maryland. Ryan Homes' formal connection with the resulting project is not entirely clear and, in some respects, disputed. For the purposes of this appeal, however, it is important to note that Edward Ryan actively sought in 1965 an accomplished executive to manage the St. Charles development. After failing to persuade his brother, James, to undertake the task, Edward Ryan attempted to recruit Harnett.
 
 
 6
 Ryan Homes was, at the time, making preparations for a public offering of its stock. The projected market value of the stock was substantially in excess of its book value. Thus, if the employees, including Harnett, were released from their stockholder agreements with the company and permitted to participate in the public offering, they could reap substantial profits. At a meeting of the Board of Directors on April 24, 1965, however, Edward Ryan, in the presence of Harnett, announced, on the basis of advice from the underwriters, that he himself would be the only employee allowed to participate in the public offering, and that no other employee would be able to sell his shares to the public for five years.
 
 
 7
 On May 13, 1965, Harnett and Edward Ryan agreed that Harnett would resign from Ryan Homes, sell his stock back to the company for $150. per share, accept significant responsibilities with another corporation involved in the St. Charles project, and receive a salary increase from $1700. to $4000. per month. The portion of the agreement relating to the sale of the stock provided further that Harnett would receive any difference between the $150. per share figure and the stock's book value on December 31, 1965. The $150. price was later reduced to $142., but the provision for payment of the difference between the June, 1965 selling price and the December 31st book worth figure remained unaltered. Harnett's move to the St. Charles project proved particularly propitious.
 
 
 8
 Although the district court made no specific finding, it did note that Harnett became very wealthy as a result of his involvement in the St. Charles development, owning at the time of the lawsuit, stock worth $6,750,000.
 
 
 9
 Ryan Homes did not go public in 1965 as contemplated, and business reversals delayed the public offering of Ryan Homes stock until 1968. However, in April, 1965, when he stated to the Board that employees would no be free to participate in the public offering, Edward Ryan apparently had given some thought to permitting such participation if the underwriters so agreed. In fact, in 1968, some Ryan Homes employees, in addition to Edward Ryan, were permitted to sell their stock to the public.[4]
 
 
 10
 Harnett, in his capacity as seller of his stock in Ryan Homes, claimed below, among other things, that Edward Ryan's failure to reveal to him in April, 1965 Edward's thoughts with respect to the possible employee participation in the impending public offering breached Rule 10b-5. These thoughts, at that time, were, at least in part, in writing. Harnett also asserted that Edward Ryan and Ryan Homes did not fulfill their obligation, included in the agreement terminating Harnett's employment with Ryan Homes, to compensate him for the difference between the $142. per share payment and the December 31, 1965 book value figure of the stock.
 
 
 11
 Ryan and Ryan Homes denied the existence of both a violation of 10b-5 and a duty to pay to Harnett any additional consideration for the Ryan Homes stock. In addition, they contended that Harnett received payments amounting to $16,000. not attributable to any services performed for Ryan Homes by Harnett. Edward Ryan and Ryan Homes sought to set-off this allegedly mistaken payment of $16,000. against any recovery Harnett might receive.
 
 
 12
 The district court, in an oral opinion delivered from the bench on June 12, 1972, that carefully analyzed the factual material presented, rejected Harnett's 10b-5 claim. It, in effect, appeared to conclude that Harnett's behavior would not have been different had Edward Ryan disclosed in April, 1965, his thinking with regard to possible employee participation in the public offering. The following excerpts from the district court's oral opinion seem to suggest that it found an absence of reliance on the part of Harnett to be dispositive:
 
 
 13
 The real problem is that we do not believe that the plaintiff was deceived. We do not believe that he sold his stock in Ryan Homes because of the alleged misrepresentation or failures to disclose the conditions he claims of.
 
 
 14
 After listing three factors that, according to the court, prompted Harnett's decision to sell his Ryan Homes stockthe salary increase, the opportunity to enhance his image as a successful business man, and the desire to impress Edward Ryan and retain his good will-- the court stated further:
 
 
 15
 The things left unsaid were not material to the transaction in the sense that they induced plaintiff's actions, and the plaintiff was not misled by the silence of Mr. Ryan, if in fact there was silence.[5]
 
 
 16
 The District court's oral opinion came just after the Supreme Court's decision in Affiliated Ute Citizens v. United States.[6]
 
 
 17
 After thus disposing of Harnett's 10b-5 allegation, the district court entered a verdict for Harnett for $18,790. on his claim for payment under that part of the agreement requiring Ryan Homes to compensate Harnett for the difference between the $142. per share delivered in June, 1965 and the stock's book value on December 31, 1965. The court announced that the verdict was subject to further review of the documentary evidence. In its oral opinion, the court did not deal with the $16,000. set-off claimed by Edward Ryan and Ryan Homes.
 
 
 18
 On June 8, 1973, the district court issued a written opinion and order denying the various motions for new trial and judgment n.o.v.[7] In its written opinion, the court substantially adopted the findings of fact recited in its earlier oral opinion, but its 'conclusions of law (were) somewhat modified.'[8] Specifically, with respect to Harnett's 10b-5 claim, the court stated in its written opinion:
 
 
 19
 The statute and rule only require that an insider reveal 'material facts.' We think the subsequent plan (to allow employees to participate in the public offering) was nothing more than his random thoughts reduced to paper and need not be revealed. Along a continuum between solid, important information and rank speculation, surely the former must be revealed but the latter need not be. It would be impossible to peg Edward Ryan's 'plan' at some point along the continuum. Suffice it to say we think it was closer to the latter, i.e., speculation. Edward Ryan's freedom of decision and action in this area was severely circumscribed by the dictates of the stock underwriter. The plan was not a plan which Edward Ryan could unilaterally put into effect. Early 1965 was a period of especially intense planning and negotiation among various parties about . . . the possibility of Ryan Homes going public. Absent some evidence that it was something more, we think that the 'plan' was only the kind of speculation or/aspiration that continually occupies the minds of businessmen.[9]
 
 
 20
 It would appear, therefore, that the court, in disposing of Harnett's 10b-5 claim, receded somewhat from the absence-of-reliance rationale utilized in its oral opinion and, instead, in its written opinion, focused on the lack of materiality of the omission, the matter now being stressed by Harnett. In addition, in its written opinion, the court refused to alter its verdict of $18,790. For Harnett and expressly rejected the set-off claim of Ryan and Ryan Homes.
 
 
 21
 On this appeal, Harnett, in substance, contends that the district court erred in characterizing Edward Ryan's thoughts and writings relating to the possibility of employee participation in the proposed public offering as 'speculation,' and that these undisclosed cogitations satisfied the tests of materiality set forth by this Court in Kohn v. American Metal Climax, Inc.[10] and by the Second Circuit in List v. Fashion Park, Inc.[11]
 
 
 22
 On their cross-appeal, Ryan and Ryan Homes challenge Harnett's recovery of $18,790. under the agreement terminating his employment with Ryan Homes. They also claim a $16,000. set-off. In both instances, they rely primarily on an alleged absence of consideration supporting any agreements to pay these moneys.
 
 
 23
 Since the respective appeals are from the district court's judgment dated June 8, 1973, denying the various motions for new trial and judgment n.o.v., we must, of course, address that judgment and the reasoning supporting it as expressed in the court's written opinion also filed on June 8, 1973.
 
 
 24
 The complementary concepts of materiality and reliance have injected uncertainty into the jurisprudence of the Securities and Exchange Act of 1934.[12] This uncertainty may well stem from a partial incongruence, in the context of private litigation, between the traditional tort requirement that there be a causal link between the wrongdoer's action and the plaintiff's injury and the statutory purpose of discouraging sharp, ethically-suspect, and fraudulent business practices. In most tort cases analogous to 10b-5 actions, the injured plaintiff's reliance on the defendant's deception constitutes the significant element of the causal link. In certain situations where plaintiff's reliance is doubtful, a choice must be made, it would seem, between achieving the statutory purpose and preserving the causal connection ingredient.
 
 
 25
 The role of reliance in various Rule 10b-5 cases, has never been entirely clear. In the case of an elleged material omission, such as the claim Harnett asserts on this appeal, the Supreme Court has provided recent guidance. In Affiliated Ute Citizens v. United States,[13] it stated that:
 
 
 26
 'Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making his decision . . .. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.'[14]
 
 
 27
 In Rochez Bros., Inc. v. Rhoades,[15] this Court construed the Supreme Court's language in Ute in the following manner:
 
 
 28
 'We do not read this decision (Ute) to say that the question of reliance vel non may not be considered at all in a non-disclosure case, but only that proof of reliance is not required for recovery. If defendant is able to demonstrate that there was clearly no reliance, that is, that even if the material facts had been disclosed, plaintiff's decision . . . would not have been different from what it was, then the non-disclosure cannot be said to have caused the subsequent loss and under the ordinary principles of the law of fraud, recovery should be denied.'[16]
 
 
 29
 Since the judgment appealed from in the present case turned on the absence of materiality, rather than the basence of reliance, the principles relating to reliance enunciated in Ute and Rochez would not appear to be controlling.
 
 
 30
 Fortunately, in this case, we are not faced with the choice between the tort requirement of a causal connection and the statutory purpose, for the district court, in its written opinion, held that the undisclosed facts were not material. We need, however, determine whether the factual predicate leading to the district court's conclusion of nonmateriality is clearly erroneous,[17] and whether in assessing the materiality of the factual predicate the district court correctly applied the proper standard.
 
 
 31
 The district court concluded, after a non-jury trial concerning the business and financial intricacies of Ryan Homes and the relationship among the various personnel, that the undisclosed facts constituted 'nothing more than Edward Ryan's random thoughts reduced to paper.' Our examination of the record reveals little testimony or documentary evidence tending to establish that the so-called undisclosed material were, actually, more than Edward Ryan's random thoughts.
 
 
 32
 Harnett, in challenging the district court's finding, relies primarily on a colloquy between Edward Ryan and Harnett's counsel during cross-examination and a document dated May 28, 1965, allegedly reflecting Edward Ryan's intention to permit employee participation in the public offering. Referring to the document dated May 28, 1965, Harnett's counsel asked Edward Ryan, inter alia, whether it was 'the plan,' as of May 28, 1965, to permit certain employees, not including Ryan, to sell a limited number of shares to the public. Ryan merely responded in the affirmative. The sobriquet 'plan' was attached to Edward Ryan's rumination by Harnett's counsel, not the district court nor, indeed, Edward Ryan himself. Also, this testimony comprised only an exiguous segment of a lengthy record.
 
 
 33
 Furthermore, the document indicating that Edward Ryan contemplated employee participation in the public offering, apart from possessing on its face ambiguous import, is, quite significantly, dated May 28, 1965, over two weeks after Edward Ryan and Harnett initially reached agreement regarding the sale of the Ryan Homes stock back to the corporation. Hence, even if it were to be conceded that Edward Ryan's thoughts attained a greater degree of substantiality by virtue of their reduction to writing, such event did not occur until after Harnett and Edward Ryan had agreed to the stock sale. Thus, it is difficult to see how this memorandum, on which plaintiff relies, so heavily could be considered material with respect to Harnett's earlier agreement to sell back his stock.
 
 
 34
 In light of the questionable significance of the portions of the record relied on by Harnett, we cannot say that the district court erred in finding, after acquiring an understanding of the complicated affairs of Ryan Homes during 1965, that Edward Ryan's personal views concerning employee participation would not, at least in their then incipient state, have a significant impact on the course of those affairs. Nor can we say that the finding of the district court that the underwriters' position in the matter would probably be decisive is clearly erroneous.
 
 
 35
 However, Harnett argues that Ryan's sentiments regarding employee participation 'might have been considered important by a reasonable shareholder who was in the process of deciding (whether to sell his shares)'[18] or that 'a reasonable man would attach importance (to Ryan's thoughts) in determining his choice of action in the transaction in question.'[19] These statements represent alternative formulations of the materiality test and reveal its objective nature.[20]
 
 
 36
 Although the district court did not recite any of the standard materiality tests, it would appear that it did, in fact, conclude that a reasonable shareholder would not 'attach importance' to Ryan's April, 1965 views concerning possible shareholder participation. The district court's written opinion seems to reflect the principles enunciated in Ute, and insofar as the opinion may not reflect those principles precisely, Ute, of course, controls. The undisclosed facts were, according to the district court, 'only the kind of speculation or aspiration that continually occupies the minds of businessmen,' and, it would seem to follow, not the type that are likely to influence dealings in the stock of corporations.
 
 
 37
 The district court's finding that these undisclosed celebrations represented no more than a set of the numerous thoughts that separately occupy, at their early stages, slight portions of a business executive's time leads us to agree with the district court's conclusion that they were not material. In the corporate world, as elsewhere, the initial ruminations of executives must complete a circuitous course before becoming, if ever, actuality. Further, if we were to require corporate officers to disclose inchoate ideas, musings as it were, on matters that relate to the value of their companies' stock, few stock transactions in which they participate would avoid the possible charge of a Rule 10b-5 violation. If, on the other hand, the district court had found that the undisclosed facts were something more than Edward Ryan's thoughts and that they would likely have an identifiable impact on the fact of any proposal for employee participation in the public offering, a conclusion that the undisclosed facts were material might well have been warranted.
 
 
 38
 In sum, the findings underpinning the district court's conclusion are not clearly erroneous; the district court's discussion of Harnett's Rule 10b-5 claim reveals an appreciation of the materiality standard; and, in this case, applying that standard to the facts found by the district court requires the rejection of Harnett's Rule 10b-5 claim.
 
 
 39
 As for Harnett's contractual allegation for $18,790. and the assertion of Edward Ryan and Ryan Homes that they are entitled to a $16,000. set-off, we agree with the district court that the evidence sustains the conclusion that the agreements at issue were supported by consideration flowing from Harnett to Ryan and Ryan Homes. Hence, Harnett is entitled to $18,790. undiminished by any set-off.
 
 
 40
 Accordingly, the judgment of the district court will be affirmed.
 
 
 
 [1]
 'Sec. 10. It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of the facility of any national securities exchange--
 . . . . It
 '(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in controvention of such rules and regulation as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.' 15 U.S.C. 78j(b).
 
 
 [2]
 'It shall be unlawful for any person, directly or indirectly by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 '(a) To employ any device, scheme, or artifice to defraud,
 '(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 '(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.' 17 C.F.R. 240.10b-5.
 
 
 [3]
 Harnett v. Ryan Homes, Inc., D.C., 360 F.Supp. 878 (1973)
 
 
 [4]
 During the period between 1965 and 1968, employees of Ryan Homes purchased substantial amounts of its stock, just as Harnett had done prior to 1965. Also, employees, who left the corporation during that period, including Edward's brother, James, were required, as was Harnett, to sell back their stock in the company. On the basis of these facts, Edward Ryan argues that it is not reasonable to conclude that Edward Ryan sought to defraud Harnett to the extent of the difference between the $150. per share price paid and the projected market value of the 1000 shares that Harnett owned
 
 
 [5]
 Tr. at 1821-22
 
 
 [6]
 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); see note 15 infra
 
 
 [7]
 Harnett v. Ryan Homes, Inc., D.C., 360 F.Supp. 878 (1973)
 
 
 [8]
 Id. at n. 2. The modifications were undoubtedly occasioned by an awareness of the precepts set forth in Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), a decision that came down shortly before the district court's oral verdict. See note 15 infra
 
 
 [9]
 360 F.Supp. at 889
 
 
 [10]
 458 F.2d 255, 269 (3d Cir.), cert. denied, 409 U.S. 814, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972)
 
 
 [11]
 340 F.2d 457, 462 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965)
 Edward Ryan and Ryan Homes do not squarely meet Harnett's arguments that the district court's finding regarding the insubstantial nature of Edward Ryan's thoughts was erroneous and that the district court's conclusion that the omission was not material was incorrect. Instead, Edward Ryan and Ryan Homes assert that the district court's finding that there had been no misrepresentation-- a finding that Harnett seems no longer to dispute-- precludes recovery under 10b-5 and, further, that Harnett's 'insider' status and the existence of the agreement to resell the stock render 10b-5 inapplicable to the situation.
 
 
 [2]
 'Because there is much disagreement and confusion among the parties concerning the meaning and applicability of 'reliance' and 'materiality' under Rule 10b-5, we think it advisable first to set forth the well-known and well-understood common law difinitions of these terms and the reasons for the rules in which the terms are incorporated. Insofar as is pertinent here, the test of 'reliance' is whether 'the misrepresentation is a substantial factor in determining the course of conduct which results in (the recipient's) loss.' Restatement, Torts 546 (1938); accord, Prosser, Torts 550 (2 ed. 1955); I. Harper & James, Torts 583-84 (1956). The reason for this requirement, as explained by the authorities cited, is to certify that the conduct of the defendant actually caused the plaintiff's injury. The basic test of 'materiality,' on the other hand, is whether 'a reasonable man would attach importance (to the fact misrepresented) in determining his choice of action in the transaction in question.' Restatement, Torts 538(2)(a); accord, Prosser, Torts 554-55; I. Harper & James, Torts 565-66. Thus, to the requirement that the individual plaintiff must have acted upon the fact misrepresented, is added the parallel requirement that a reasonable man would also have acted upon the fact misrepresented.' List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir. 1965)
 
 
 [13]
 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)
 
 
 [14]
 Id. at 153-154, 92 S.Ct. at 1472
 
 
 [15]
 491 F.2d 402 (3d Cir. 1973)
 
 
 [16]
 Id. at p. 410
 
 
 [17]
 'Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. F.R.Civ.P. 52(a); see Rochez Bros., Inc. v. Rhoades, 491 F.2d 402 at p. 408 (3d Cir. 1973)
 
 
 [18]
 Mills v. Electric Auto-Lite, 396 U.S. 375, 384, 90 S.Ct. 616, 621, 24 L.Ed.2d 593 (1970); see Kohn v. American Metal Climax, Inc., 458 F.2d 255, 269 (3d Cir.), cert. denied, 409 U.S. 874, 93 S.Ct. 120, 34 cert. denied, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972)
 
 
 [19]
 List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir.), cert. Denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); see Rochez Bros., Inc. v. Rhoades, 491 F.2d 402 (3d Cir. 1973). That portion of List dealing with reliance apparently has been undercut, in part, by Ute. 406 U.S. at 152-153
 
 
 [20]
 When, however, there is a single buyer allegedly hiding facts from a single seller it is difficult to divorce consideration of the probable effects of the unrevealed facts from the particular circumstances of the solitary seller. Indeed, it may be argued that the distinction between the objective materiality test and the subjective reliance test breaks down in such circumstances