524 F.2d 577
 Fed. Sec. L. Rep. P 95,322
Morton I. THOMAS et al.
v.
DURALITE COMPANY, INC., a New York Corporation, Appellant in
No. 75-1045, et al.
Appeal of Bertram R. LESSER and Irving H. Zakin, in No. 75-1044.
Appeal of Morton I. THOMAS, in No. 75-1046.
 Nos. 75-1044 to 75-1046.
 United States Court of Appeals,
Third Circuit.
 Argued June 26, 1975.
Decided Oct. 8, 1975.
 
 Pitney, Hardin & Kipp, Newark, N. J., for Morton I. Thomas, Edco Surgical Supply Co., and Temco Products, Inc.; William D. Hardin, Cary J. Frieze, Newark, N. J., of counsel.
 Golenbock & Barell, New York City, and Sidney Krieger, Newark, N. J., for Duralite Company, Inc.; Arthur M. Handler, Robert S. Goodman, New York City, of counsel.
 Jesse Climenko, Shea, Gould, Climenko, Kramer & Casey, New York City, and Cole, Berman & Belsky, Paterson, N. J., for Bertram R. Lesser and Irving Zakin.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 The sale of stock in a closely held corporation, induced by misrepresentation and nondisclosure of material information, is the basis of this 10b-5 suit. We conclude that inaccurate statements about the lack of improvement in the financial health of the corporation and failure to reveal nascent negotiations for acquisition establish liability. However, a damage award which amounts to an overly generous windfall must be remanded for further consideration.
 
 
 2
 In 1949, plaintiff Morton Thomas and defendant Bertram Lesser formed the Duralite Corporation to manufacture light weight aluminum furniture. Each party owned 50 percent of the company stock. In time, the company expanded and moved its operations from New York to a site in New Jersey which it rented from the Randolph Avenue Corporation, a company owned by Thomas and Lesser and created for the sole purpose of holding the real estate.
 
 
 3
 For many years the two men had a very close and cordial working relationship. They shared office space as well as management responsibilities. Generally, Thomas was more concerned with production problems while Lesser took it upon himself to oversee the financial aspects of the corporation. In 1958, they made the other individual defendant, Irving Zakin, responsible for the company's sales operations and at a later date gave him some stock in both Duralite and Randolph.
 
 
 4
 In 1964, Duralite suffered a loss of $600,000.00 which led to a deterioration of the close relationship between Thomas and the defendants. A contest for presidency of the corporation resulted, and in 1965 Thomas withdrew from all management functions of the corporation.
 
 
 5
 At that point Thomas and Lesser each owned 451/2 percent of the Duralite stock and each owned 45 percent of the Randolph shares. Lesser offered to buy out Thomas' stock in both Duralite and Randolph in 1965 but the proposal was not accepted.
 
 
 6
 Thomas then formed Temco Products, Inc., a company which utilized aluminum tubing in its products. Later, he became associated with a Donald Edwards who owned the Edco Surgical Supply Company, and by 1967 Thomas and Edwards each owned 50 percent of the stock of Edco and Temco.
 
 
 7
 In late 1967, Thomas agreed to accept $112,500.00[1] for his Duralite stock. The proposed contract between Thomas and Duralite made the sale contingent upon the consent of certain creditors of Duralite who held various security interests. Because of Duralite's weak financial condition, however, the creditors refused to approve the purchase of Thomas' stock.
 
 
 8
 In January, 1968, Lesser and Thomas met to discuss sale of his Randolph stock. Lesser disclosed that Duralite had a net loss for fiscal 1967 of $409,000.00, and conveyed the clear impression to Thomas that his stock in Duralite had no value but, rather, represented only a negative equity. The import of Lesser's conversation was that there was substantial doubt that Duralite could continue in business. He produced a written appraisal of Thomas' interest in Randolph which discounted the value because of "possible inability to sell within one year," "reduced value in event of distress sale," and "possible foreclosure if mortgage payments are not kept current." The real estate which formed the sole asset of Randolph was valued at $800,000.00, and Thomas' stock was appraised at $71,600.00. The fortunes of Randolph were necessarily dependent upon Duralite because that company was the sole tenant and source of income.
 
 
 9
 During the meeting, Thomas indicated that he would consider a transfer of his Duralite stock in exchange for cancellation of his loan and of Edco's indebtedness. A few weeks thereafter, Thomas' accountant verified the $409,000.00 loss but evaluated Thomas' interest in Randolph at $91,272.00.
 
 
 10
 At about this same time, and unknown to Thomas, several discussions took place between the defendant Zakin and James H. Kaltsas, the president of Prest-Wheel Company, also a manufacturer of porch furniture. Although nothing definite was proposed, there were some vague allusions to a possible merger between Prest-Wheel and Duralite.
 
 
 11
 At a subsequent meeting in early April, 1968, Lesser gave Thomas the impression that Duralite was faced with imminent disaster. In response to Thomas' question about the company's progress, Lesser responded vaguely, but in substance, that the situation had not changed. In fact, it had improved and ultimately Duralite would have a profitable year. Lesser remarked that he was staying with Duralite only for the salary and hoping that somebody might find some interest in the company. Lesser carefully did not disturb Thomas' impression that the stock was worthless.
 
 
 12
 The contract for the sale of Thomas' interests in Duralite and Randolph to the latter company was finally completed and signed on June 18, 1968. Soon afterwards, Lesser transferred some of his stock so that Zakin would own one-third of the outstanding shares in both Duralite and Randolph and Lesser would own two-thirds. The conversations between Zakin and Kaltsas still had not been disclosed to Thomas.
 
 
 13
 A few days after the signing of the Thomas contract, Zakin and Kaltsas discussed a possible merger with Giffen Industries. Kaltsas stated that he was confident Giffen would want Duralite. Zakin then telephoned Lesser and told him about the merger possibility.
 
 
 14
 On November 21, 1968, the transfer of the plaintiff Thomas' stock was completed. The total consideration was $109,892.81.
 
 
 15
 On December 5, 1968, Kaltsas brought an official of Giffen Industries to New York where they joined Zakin and then met with Lesser in New Jersey. After less than two hours of negotiations, the parties agreed that all of the Duralite stock held by Lesser and Zakin would be exchanged for 16,667 shares of Giffen. At that time Giffen stock was selling at $60.00 in the over-the-counter market. On the following day, the official of Giffen met again with Lesser and agreed to exchange an additional 16,667 shares for the stock in the Randolph Corporation.
 
 
 16
 A letter agreement of January 8, 1969 provided for the acquisition of all the shares of Duralite and Randolph by Giffen and for five-year employment agreements with Lesser and Zakin at salaries of $40,000.00 per year. Within the next few weeks, the price of Giffen stock fell from $60.00 to $40.00. To meet this change in value, an agreement of February 28, 1969 increased the number of Giffen lettered shares giving Lesser 30,000 and Zakin 15,000 shares.
 
 
 17
 At the closing transaction on March 31, 1969, Lesser and Zakin delivered all of their Duralite stock.[2] Giffen was not required to produce its shares then since the agreement provided that the company was to use its best efforts to register the stock before December 31, 1969 and then turn over the certificates to Lesser and Zakin. In the interim, they continued to work for Duralite which had become a wholly-owned Giffen subsidiary.
 
 
 18
 Upon discovery of this chain of events, Thomas filed suit for damages on June 2, 1969, alleging that he was induced to sell his shares of Duralite and Randolph for $109,892.81 at a time when they had a value in excess of $1,000,000.00. Edco and Temco joined in the suit as plaintiffs, alleging that their agreement to purchase certain material from Duralite was void as a result of the fraudulent stock transaction.
 
 
 19
 Giffen's fortunes continued to ebb and, by the end of 1969, it was unable to transfer the 45,000 shares of registered stock as required. Lesser and Zakin then sought to rescind the agreement.
 
 
 20
 According to Giffen's chairman, Duralite had proved to be profitable, and Lesser and Zakin had become very valuable to the company. On April 17, 1970, after a series of negotiations, a new agreement was reached between Giffen and the defendants. As a result, the Randolph real estate was conveyed to Lesser and Zakin, the property being subject to a long-term lease to Duralite, and in November of 1970, the two men received $600,000.00 in cash and notes. The employment contracts were amended to increase the defendants' salaries from the $40,000.00 originally agreed upon to $55,000.00, retroactive to January 1, 1970.
 
 
 21
 The suit in the district court alleged violations of §§ 10(b), 20 and 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j, 78t, and 78cc(b), and Rule 10b-5. A pendent claim asserting fraud under New Jersey law was included in the complaint. Defendant Duralite filed counterclaims against Edco and Temco for the value of products delivered to them and for certain inventory items which they had ordered but later refused to accept.
 
 
 22
 After a lengthy non-jury trial, the district court accepted the plaintiff's contention that the defendant Lesser had misrepresented a critical fact with intent to deceive Thomas. Lesser was found to have spoken falsely in April of 1968 in describing a loss situation in Duralite and the worthlessness of its stock. The court considered defendant's silence between that time and June 18, 1968, when the contract of sale was signed, to be an affirmation that nothing had changed.
 
 
 23
 Damages were awarded to the plaintiffs and against Lesser and Zakin in the sum of $821,148.15, representing the difference between what Thomas received for his stock in 1968 and the amount which Lesser and Zakin received in 1970 when the new arrangement was negotiated. Prejudgment interest was also included. Since the court believed that Duralite had not shared in the "windfall" profits of the 1970 transactions, a judgment against it was limited to $131,257.19 (the difference in value of Thomas' stock on November 21, 1968 and what he actually was paid), plus interest from that date, for a total of $178,164.55. Liability over for that amount was entered against Lesser and Zakin.
 
 
 24
 Judgment was entered in favor of Duralite on its first counterclaim for goods delivered to Edco and Temco in the amount of $17,175.88. The second counterclaim for goods ordered but not delivered was dismissed with prejudice.
 
 
 25
 We affirm the finding of liability against Lesser and Zakin, but reverse as to Duralite and remand for further consideration of damages.
 
 
 26
 Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), prohibits the use of fraudulent schemes in connection with the purchase or sale of securities. Rule 10b-5 of the Securities and Exchange Commission, enacted to implement the statutory purposes, reads:
 
 
 27
 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of national securities exchange,
 
 
 28
 (a) To employ any device, scheme, or artifice to defraud,
 
 
 29
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 
 
 30
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 
 
 31
 in connection with the purchase or sale of any security."
 
 
 32
 The elements of a plaintiff's case on liability include knowledge by the defendants, intent to defraud (scienter), failure to disclose to the plaintiff, materiality of the facts, and, in some instances, reliance by the plaintiff. See 3A H. Bloomenthal, Securities and Federal Corporate Law § 9.21 (1972).
 
 A.
 SCIENTER
 
 33
 The Duralite business of manufacturing summer porch furniture was seasonal in nature. The cycle began in late August or early September, with production being geared toward sales of furniture during the spring and summer following. The company's sales were substantially completed by July 4, and its fiscal year ended July 31.
 
 
 34
 The defendants contended that, because of their accounting procedures, it was not possible to know with any degree of certainty whether a year would be profitable until the completion of the physical inventory which took place some time after July 31. The district court, however, found that by June of each year defendant Lesser had sufficient information to predict profitability. Consequently, by the time the contract with Thomas was signed on June 18, 1968 the defendants were aware of Duralite's expectations for that fiscal year.
 
 
 35
 The court observed that it was not critical to the plaintiff's case that he prove that Lesser had been able to predict precisely the extent of any profit by June. It was enough that he perceived a turnaround in Duralite's prospects between January and June of 1968. The threat of bankruptcy which was so strong in January had subsided by April and was little more than a memory by June.
 
 
 36
 Lesser was held accountable for affirmative misstatement rather than simply a failure to disclose. As the court phrased it, "(w)hen Lesser spoke of a 'loss situation' in April, and the worthlessness of Duralite's stock, he spoke falsely and with intent to deceive Thomas by wielding Thomas' misplaced fear of bankruptcy as a weapon to aid Lesser in obtaining Thomas' stock."
 
 
 37
 As in Rochez Bros, Inc. v. Rhoades, 491 F.2d 402 (3d Cir. 1974), we need not grapple at any length with the division of authority on whether an actual intent to defraud must be proved. See Kohn v. American Metal Climax, Inc., 458 F.2d 255 (3d Cir.) (Adams, J., concurring), cert. denied, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972); 3 Loss, Securities Regulations § 1766 (1961). Knowledge and failure of disclosure were found by the district court and we are unable to say that these findings are clearly erroneous. They provide adequate basis for culpability on the part of Lesser and Zakin.
 
 B.
 MATERIALITY
 
 38
 The nondisclosure of the Zakin-Kaltsas talks and the brightening on Duralite's financial horizon were found to be of "critical importance to Thomas." The trial judge concluded that had the plaintiff been aware of Duralite's improved health, he would not have agreed to sell the stock at the price he did.
 
 
 39
 Generally speaking, the test of materiality is an objective one that is, whether a reasonable man would attach importance to the particular facts in controversy. See Rochez Bros., Inc. v. Rhoades, supra; Landy v. Federal Deposit Insurance Corporation, 486 F.2d 139 (3d Cir. 1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). But there is an interplay between materiality and reliance which tends to blur the distinction between them when the factual backdrop changes. Thus, it is not difficult to accept the necessity for a clearly enunciated objective standard when the 10b-5 suit affects a large number of shareholders who may have had no direct or continuing contact with the corporation. But when the scene shifts to a situation where a single purchaser who is well known to the seller actively conceals facts, the distinction between objective materiality and subjective reliance becomes obscured. See Harnett v. Ryan Homes, Inc., 496 F.2d 832, 838 n. 20 (3d Cir. 1974). As one authority in this field of the law has observed:
 
 
 40
 "(M)ateriality needs to be more pronounced and more carefully measured in open-market transactions because of potential massive liability to hordes of investors who are in fact trading on a variety of data, appraisals, and intuitions. Some sort of reasonable-man, objective test of investment judgment, intrinsic value, or (in the case of a publicly traded security) significant market effect is appropriate . . . A looser or more subjective one may . . . be proper in direct-personal transaction because of the greater ability of one party to appreciate the position of the other." 2 A. Bromberg, Securities Law: Fraud § 8.3 at 199 (1971).
 
 
 41
 Even if we were to discount the subjective nature of materiality, it is apparent from the record that the district court was aware of the objective test as well. Thus, when the plaintiff learned that the situation had not improved in April, the court said that Thomas took the reasonably prudent course of getting out as quickly as he could. Moreover, in assessing the importance of the Kaltsas consultations, the trial judge emphasized the distinction between the hopes for imminent acquisition by Giffen and the initial executive ruminations cited in Harnett v. Ryan Homes, Inc., supra.
 
 
 42
 Therefore, while the district court's opinion did not specifically find materiality in terms of an objective standard, such a conclusion is implicit in the general discussion. Further, a review of the facts as found by the trial judge establishes to our satisfaction that there is enough to satisfy the reasonable-man test.
 
 
 43
 Much of the appellants' argument here centers on the alleged unreliability of Kaltsas' testimony because of his bias against the defendants. The district court was cognizant of this factor but decided, nevertheless, that Kaltsas' version of the incidents was more credible than the defendants'. Having had the opportunity to observe the witness, the trial judge was in a far better position than are we to determine credibility. We will not disturb his finding on this issue. See United States v. Harris, 507 F.2d 197 (3d Cir. 1975).
 
 
 44
 The transfer of a portion of Lesser's stock to Zakin on June 23, 1968 was the result of an agreement between the two men which they had reached shortly before Thomas signed the contract on June 18, 1968. The court found that the transaction "was intended to put Zakin in a position to enjoy a greater participation in the event of a takeover by Giffen Industries." When Kaltsas met with Zakin soon thereafter, the court noted that "Zakin, for his part, told Kaltsas that a partner in Duralite had been bought out, that Zakin's percentage in the company was now higher than it had been, and that now the Duralite people were 'free' to work on negotiations."
 
 
 45
 There was an evidentiary basis for the determination that the preliminary discussions between Zakin and Kaltsas did establish the likelihood of acquisition by Giffen. It is not unreasonable to assume that more specific negotiations were deliberately postponed until after arrangements to purchase the Thomas stock had been completed. We cannot say that the district court erred in drawing such an inference and concluding that this conduct of the defendants tended to prove the materiality of the Kaltsas negotiations.
 
 C.
 RELIANCE
 
 46
 If a defendant were to demonstrate that plaintiff's decision would have been the same even if the withheld information had been disclosed, then there would be no liability. Rochez Bros., Inc. v. Rhoades, supra. That defense need not detain us here because the trial court made specific findings of reliance. It stated in particular that Thomas "would have returned to his original demands" if he had known the true profit picture. Had he been told of the possible sale to Giffen, "he would not have sold his stock in June but would have joined the negotiations or, at the very least, would have waited to see the developments."
 
 
 47
 The district court held that the denial of change in Duralite's financial condition in April constituted affirmative misstatements. The application of reliance in that situation varies from that concerned with the acquisition discussions. The failure to reveal the negotiations with Kaltsas is in the nature of passive, rather than active conduct, and the importance of reliance is lessened.
 
 
 48
 In Affiliated Ute Citizens v. United States, 406 U.S. 128, 153, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), a nondisclosure case, the Supreme Court indicated that positive proof of reliance was not necessary. The difficulty of establishing reliance on a negative is obvious[3] and the burden of proving nonreliance rests upon the defendants, Rochez Bros., Inc. v. Rhoades, supra. They failed to meet that burden here.
 
 
 49
 The plaintiff, as an "insider," had the duty of using due care to ascertain the relevant facts, Rochez Bros., Inc. v. Rhoades, supra. He met the test because the trial judge was satisfied that Thomas did not have access to all the records of Duralite particularly the monthly financial report and other information which would have alerted him to the deception.
 
 
 50
 The conclusions of the district court establishing liability on the part of defendants Lesser and Zakin are supported by the evidence and will be affirmed.
 
 D.
 LIABILITY OF DURALITE
 
 51
 The district court drew valid distinctions between the conduct of Lesser and Zakin and the inactivity of the Duralite Corporation itself. The court said, "There was no community of interest, sharing of benefit, or joint undertaking between Lesser and Zakin, on the one hand, and the Duralite-Randolph corporate complex, on the other." The individual defendants acted only in their own personal interests, and it is clear that Thomas knew this to be so. Moreover, Duralite did not purchase Thomas' shares.
 
 
 52
 Any judgment payable by Duralite would be at the expense of the members of the public who held Giffen's shares. The court noted that the rationale of allowing recovery for windfall profits was not applicable to the passive corporation and, accordingly, entered a judgment against Duralite for compensatory damages only. This conclusion was reached because ". . . Duralite's liability attach(ed) only through operation of law; it was not itself in pari delicto . . ."
 
 
 53
 The court was obviously reluctant to enter any judgment against Duralite but, apparently, believed it was required to do so by virtue of the doctrine of respondeat superior. We do not believe that that concept is applicable here. This court, in Rochez Bros., Inc. v. Rhoades, II, --- F.2d --- (3d Cir. 1975), held that the corporation was not liable for the fraud of its principal shareholder since no showing had been made of participation, aiding and abetting, conspiracy or conduct falling within the ambit of Section 20. We believe that decision controls and, accordingly, the judgment against Duralite will be vacated.[4]
 
 E.
 DAMAGES
 
 54
 In a 10b-5 case, the measure of damages is the difference between what the seller received for his stock and what he would have received had there been no fraudulent conduct. If the defendant, however, on resale received more than the latter amount, then the award is the amount of the defendant's profit over and above what he had paid to the plaintiff. In that situation, the profit is considered a proximate consequence but must be limited to the amount not due to the defendant's own special efforts after the fraud occurred. Affiliated Ute Citizens v. United States, supra; Rochez Bros., Inc. v. Rhoades, supra at 411-17; Janigan v. Taylor, 344 F.2d 781 (1st Cir.), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965). See 3 A. Bromberg, supra, § 9.1.
 
 
 55
 In applying the general rule to the facts in this case, a review of the chronology is helpful.
 
 
 56
 On June 18, 1968, the plaintiff agreed to sell his stock and the price was fixed by the parties.
 
 
 57
 On February 28, 1969, Lesser and Zakin agreed to sell their stock to Giffen in exchange for 45,000 shares of lettered Giffen stock. The court found the value of the stock to be $530,000.00. None of the parties contends that value of the stock on June 18, 1968 was greater than this and it appears to be conceded that it was less.
 
 
 58
 On June 3, 1969, the plaintiffs filed suit asking for damages.
 
 
 59
 On April 17, 1970, after discussions between Lesser, Zakin, and Giffen's chairman, the Board of Directors of that company authorized a partial rescission. On July 24, the defendants and Giffen entered into an agreement providing that:
 
 
 60
 1. Lesser and Zakin would assign 16,000 shares of Giffen stock to Duralite; Duralite in turn would transfer the Randolph premises to Lesser and Zakin, or their nominee;[5] Duralite would enter into a long term lease for the Randolph property.
 
 
 61
 2. Lesser and Zakin's employment contracts were amended as of January 1, 1970 to increase their salaries from $40,000.00 to $55,000.00.
 
 
 62
 3. Giffen was to deliver 54,000 shares of its stock by November, 1970 and if it was unable to do so, would instead give Lesser and Zakin cash and notes totalling $600,000.00. At the time set for delivery, Giffen did in fact deliver the cash and notes.[6]
 
 
 63
 The negotiations of April and July, 1970 may fairly be considered part of the original transactions and not a separate, subsequent sale. Viewed in this light, the district court did not err in awarding damages to the plaintiffs based upon completion of the sale in November, 1970 rather than upon the incomplete transaction set out in the contract of February 28, 1969. However, we do not believe that the court correctly evaluated the situation existing in the spring and summer of 1970. The trial judge did not adequately credit Lesser and Zakin with the results of their special efforts and talents on Giffen's behalf following the 1969 agreements.
 
 
 64
 In 1968, Thomas' role in Duralite was in sharp contrast to those of Zakin and Lesser. Thomas had not been active in the management of the company for several years and was not contributing any of his skills to Duralite's progress. His sole interest in the company was his capital investment. If it be assumed that Thomas would have retained his stock until the acquisition, it is likely that he would have shared in the increased value produced by the agreement of February 28, 1969. Probably, to some extent, he would have benefited from the negotiations in 1970. But the considerations goading Giffen in 1970 were substantially different from those of February, 1969. Thomas' presence on the scene in 1970 as a mere shareholder would not have been of much importance to Giffen. On the other hand, Lesser and Zakin had proved their worth and Giffen reasonably may have believed that their continued association was crucial to the company.
 
 
 65
 By late 1969, the Prest-Wheel Company, Giffen's acquisition of 1968, had unexpectedly shown substantial losses, and Giffen had discharged its management personnel. Prest-Wheel had plants in Massachusetts and Arizona and its products and processes were similar to those of Duralite. It was obvious that a consolidation of the companies or their operations offered a practical solution to Prest-Wheel's urgent need for competent management. Zakin and Lesser were assigned the task of revitalizing Prest-Wheel, and by early 1970 had demonstrated their ability to take hold of the situation and start the turnaround process. In April of 1970, therefore, Lesser and Zakin, along with Duralite, were far more important to Giffen than they had been in February of 1969.
 
 
 66
 The district court was conscious of the change in circumstances but concluded that the increase in salary granted Lesser and Zakin as part of the re-negotiations was full recognition of their worth to the company. The employment contracts recited that:
 
 
 67
 "Whereas, the Corporation is desirous of obtaining the services of the employee in a broader capacity than heretofore . . . as full compensation for his services the corporation shall pay . . ."
 
 
 68
 To the trial court this language was conclusive. However, we believe that the contractual phraseology is not all encompassing and was not intended to be so. The realities were that but for Prest-Wheel's adversities and the managerial skills of Lesser and Zakin as performed for the Giffen enterprises, the re-negotiation in 1970 would not have been so favorable to them.
 
 
 69
 The court found that on February 28, 1969 Duralite and Randolph combined had a value of $530,000.00 and that it was impracticable to make a separate allocation for Randolph. As of a little more than a year later, the total value was determined to be $1,677,150.00, of which $1,077,150.00 was attributed to the Randolph property[7] alone and the remaining $600,000.00 to the Duralite stock. Considering that Randolph's sole asset, both in 1969 and 1970, was the same real estate and that apparently no substantial improvements had been made in the interim, the disparity in valuations is striking. It is difficult to conclude other than Lesser and Zakin's personal worth to Giffen was a very substantial factor in the re-negotiation bargaining. We rejected defendant's claim to an allowance for his special efforts in Rochez Bros., Inc. v. Rhoades, supra at 412-13, because they did not take place after the purchase of plaintiff's stock. That circumstance is not present here.
 
 
 70
 One other point merits comment. The February, 1969 agreement contained a formula through which Lesser and Zakin could obtain an additional 25,000 shares of Giffen stock if Duralite made profits in the fiscal years beginning in August 1, 1968. By July, 1970, the two men had become entitled to this supplemental increment so that the total then owed was 70,000 shares of Giffen Industries.
 
 
 71
 It is an open question whether Thomas would have been entitled to participate in this "incentive" plan had he still owned Duralite in February, 1969. The reasons for the company's profitability after 1968 were not developed at the trial but it is unlikely that Thomas' inactive role would have produced higher earnings for the firm.
 
 
 72
 As part of the settlement of July, 1970, Lesser and Zakin were required to assign their rights to 16,000 shares back to Giffen in exchange for the conveyance of the Randolph real estate. The remaining 54,000 shares were to be paid for by the $600,000.00 cash and notes.
 
 
 73
 If Thomas would not have been eligible for the "incentive" stock and the 25,000 additional shares were earned through the special efforts of Lesser and Zakin, then appropriate adjustments must be made. The $600,000.00 figure actually represented the original number of Giffen shares augmented by a portion of the "incentive" stock to which Lesser and Zakin had become entitled. Similarly, in determining the value of the Randolph property, the district court made no allowance for the assignment of 16,000 shares of Giffen stock by the defendants.
 
 
 74
 We do not attempt to re-assess the damages because in a case of this complexity that function should be performed in the first instance by the district court. Moreover, that court is able to order the production of additional evidence if that is deemed desirable.
 
 
 75
 We recognize that the theory of damages which allows windfall profits does not depend solely on the premise that, but for the fraud, the injured party would have realized these gains. Additionally, there is the philosophy that if the defendant made profits through the use of assets which he had fraudulently acquired, he should not be permitted to keep them. See Zeller v. Bogue Electric Manufacturing Corp., 476 F.2d 795 (2d Cir.), cert. denied,414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973); Janigan v. Taylor, supra. However, this approach has not been utilized to assess damages for an indefinite time in the future. As the Janigan case indicates, there are limitations to the doctrine,[8] and we remand to the district court to determine if they are applicable here.
 
 
 76
 The judgment in favor of the plaintiffs included prejudgment interest from July 24, 1970, but no reasons for the allowance appear in the opinion of the court. The defendants contend that in this case the award was punitive and should not stand.
 
 
 77
 Assessment of prejudgment interest in addition to a windfall damage award is not logically inconsistent, but a district court should be cautious in exercising its discretion in such circumstances. Interest is not to be recovered merely as compensation for money withheld but, rather, in response to considerations of fairness. It should not be imposed when its exaction would be inequitable, Blau v. Lehman, 368 U.S. 403, 414, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962).
 
 
 78
 Since the damage portion of this case must be remanded in any event, the district court should re-examine the matter of prejudgment interest, indicating its reasons for assessment if it should decide to do so. We express no opinion on whether prejudgment interest is appropriate here.
 
 F.
 STANDING OF EDCO AND TEMCO
 
 79
 As co-plaintiffs, Edco and Temco requested a declaratory judgment that the portion of the June 18, 1968 agreement requiring them to purchase inventory from Duralite was void under § 29(b) of the 1934 Act, 15 U.S.C. § 78cc(b). In response, Duralite filed two counterclaims against Edco and Temco arising from the same transaction. The first claimed reimbursement for goods Duralite had already delivered to them,[9] the second sought payment for raw materials purchased for conversion into finished products and some other items which had not yet been delivered to Edco and Temco. The parties stipulated the amount of the second claim to be $20,000.00, and the court was asked to decide whether Edco and Temco were entitled to invoke § 29(b).
 
 
 80
 The June 18, 1968 agreement recited that the sale of the Duralite and Randolph stock and the purchase of the Duralite inventory by Edco and Temco were interrelated. However, another portion of that same agreement provided that the purchase of the inventory was severable from the stock transaction. The district court held that:
 
 
 81
 "(I)n recognition of the intimate relationship between Thomas and the Edco and Temco corporations existing at the execution of the June 18, 1968 agreement, Edco and Temco, as unwilling innocent parties to the defendants' fraudulent conduct in violation of Rule 10b-5 are entitled to rescind any and all of their obligations incurred under the aforementioned agreement."
 
 
 82
 Section 29(b) permits an innocent party to void a contract which was secured by the other party in violation of a rule of the Securities Exchange Commission. Since Edco and Temco allege that the applicable rule is 10b-5, they must prove that it was violated by Duralite.
 
 
 83
 Several difficulties present themselves. First, the contract which Edco and Temco seek to avoid is for the purchase, not of securities, but for an inventory of supplies a routine commercial agreement. Second, neither Temco, Edco nor Duralite are purchasers or sellers of securities. Finally, Duralite is not vicariously liable under 10b-5 for the fraudulent misrepresentations.
 
 
 84
 Several months after this case was decided by the district court, the Supreme Court handed down an opinion in Blue Chip Stamps v. Manor Drug Stores, Inc., --- U.S. ---, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), limiting the class of plaintiffs who can maintain private actions for damages under Rule 10b-5. In that case, the plaintiff allegedly had decided not to purchase stock on the strength of defendants' misleading prospectus. In approving the Birnbaum[10] rule, the Court stated that plaintiffs who are neither purchasers nor sellers of securities have no standing to claim damages for violations of 10b-5. Soon thereafter, this court followed the Blue Chip decision in Thomas v. Roblin Industries, Inc., 520 F.2d 1393 (3d Cir. 1975). We held that the trustee in bankruptcy of a corporation had no standing to sue under 10b-5 when the alleged violation involved the sale of stock in the company by a large shareholder to third persons.
 
 
 85
 The fact that Edco and Temco sought a declaratory judgment, rather than damages, is not sufficient in the circumstances of this case to grant standing. The violations had been completed some time before the suit was filed and so the preventative aspects of an action to enjoin continuing violations which we found sufficient to relax the Birnbaum rule in Kahan v. Rosenstiel, 424 F.2d 161, 173 (3d Cir.), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970), are not present here. See 1 A. Bromberg, supra, § 4.7 at 564.
 
 
 86
 Being neither purchasers nor sellers of securities, Edco and Temco have no standing under Rule 10b-5 and, accordingly, the judgment of the district court will be vacated insofar as it held that Duralite's claim against Edco was not enforceable. The dismissal of Duralite's second counterclaim will also be vacated so that the district court may determine whether it should consider a defense based upon state law.[11]
 
 G.
 ASSESSMENT OF COSTS
 
 87
 The district judge excluded from costs awarded to Thomas the charges incurred for daily transcripts. The parties had agreed to share the expense for this service, and the order of the district court was proper.
 
 H.
 CONCLUSION
 
 88
 The findings of liability in favor of the plaintiff Thomas and against defendants Lesser and Zakin will be affirmed. The award of damages in favor of Thomas and against Lesser and Zakin will be vacated and remanded for further consideration consistent with this opinion.
 
 
 89
 The judgment in favor of Thomas and against Duralite, Inc. and in its favor over against Lesser and Thomas will be vacated.
 
 
 90
 The judgment declaring the rights of Duralite Company, Inc. against Edco Surgical Supply Co., Inc. and Temco Products, Inc. will be vacated. The judgment dismissing the second counterclaim will be vacated.
 
 
 
 [1]
 This was to be a gross price. From the $112,500.00 were to be deducted the sum of $15,583.06, a loan made to Thomas by Duralite; an indebtedness to Duralite owed by Edco amounting to $22,509.75; and an unascertained sum for purchase of material from Duralite for the use of Edco
 
 
 [2]
 Shortly before the closing, the Randolph Corporation was merged into Duralite
 
 
 [3]
 See 2 A. Bromberg, supra, § 8.6 at 209. Note, The Reliance Requirement in Private Actions under S.E.C. Rule 10b-5, 88 Harv.L.Rev. 584 (1975)
 
 
 [4]
 Whatever the merits of imposing a respondeat superior type of liability in a broker-agent relationship, e. g., Securities & Exch. Com'n v. First Securities Co. of Chicago, 463 F.2d 981 (7th Cir.), cert. denied, 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972); Kamen & Co. v. Aschkar & Co., 382 F.2d 689 (9th Cir. 1967), cert. dismissed, 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 85 (1968); Johns Hopkins University v. Hutton, 422 F.2d 1124 (4th Cir. 1970), cert. denied, 416 U.S. 916, 94 S.Ct. 1623, 40 L.Ed.2d 118 (1974), the circumstances here are completely different and require a different result. See Ruder, Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification and Contribution, 120 U.Pa.L.Rev. 597 (1972)
 
 
 [5]
 The transfer was actually made to a "new" Randolph Corporation whose stock was owned by Lesser and Zakin. The "old" Randolph had been merged with Duralite in 1969
 
 
 [6]
 The agreement of February 28, 1969 provided that in addition to the 45,000 shares of Giffen stock, Lesser and Zakin could earn an additional 25,000 shares if Duralite profits for the fiscal years beginning on August 1, 1968 exceeded certain limits. Giffen conceded that those conditions had been met and as of July, 1970, Lesser and Zakin were entitled to a total of 70,000 shares
 
 
 [7]
 The district court refused to accept Thomas' assertion that the value of the Randolph property should be based on the total of the long-term rentals discounted to present worth. We find no error in the court's rejection of that contention in the circumstances of this case
 
 
 [8]
 See Cobine, Elements of Liability and Actual Damages in Rule 10b-5 Actions, 1972 U.Ill.L.F. 651; Note: Rule 10b-5: The Rejection of the Birnbaum Doctrine by Eason v. General Motors Acceptance Corp. and the Need for a New Limitation on Damages, 1974 Duke L.J. 610
 
 
 [9]
 The parties stipulated a settlement of this claim for $17,175.88. Consequently, it is not before us
 
 
 [10]
 Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952)
 
 
 [11]
 The district court did not pass upon the question of whether Duralite would be barred from enforcing its claim under New Jersey law, and the parties have not briefed the issue in this court. Consequently, we do not pass upon it