The ESTATE OF John F. PIDCOCK, By and Through Jane Rainaud PIDCOCK as Executrix and Frank R. Pidcock, III, as Executor, Plaintiffs,

v.

SUNNYLAND AMERICA, INC., Joseph C. Harvard, individually, as officer of Sunnyland America, Inc. and as Co–Executor of the Estate of L.B. Harvard, Sr., and L.B. Harvard, Jr., as Co–Executor of the Estate of L.B. Harvard, Sr., Defendants.

Civ. A. No. 486–352.

United States District Court,
S.D. Georgia,
Savannah Division.

Feb. 8, 1989.

On Motion for New Trial May 8, 1989.

J. Wiley Ellis, Ronald C. Berry, Savannah, Ga., for plaintiffs.

William U. Norwood, Thomasville, Ga., Malcolm R. Maclean, Savannah, Ga., Griffin B. Bell, William S. Duffy, Jr., Atlanta, Ga., for defendants.

## ORDER

EDENFIELD, District Judge.

### Introduction

This action, brought pursuant to § 10(b) and § 20(a) of the Securities and Exchange Act of 1934 (15 U.S.C. § 78j(b) and 78t(a), respectively), SEC Rule 10b–5 (17 C.F.R. § 240.10b–5), and state law on fraud, was tried before the Court on September 15 and 16, 1987. The Court entered an Order in the case on November 16, 1987, and judgment was entered against plaintiff John F. Pidcock ("Pidcock")[1] and for defendants

---

1. Plaintiff John F. Pidcock is now deceased, and this action is maintained for the benefit of his

Sunnyland America, Inc. ("Sunnyland"), Joseph C. Harvard, the Estate of L.B. Harvard, Sr., and L.B. Harvard, Jr. ("Harvards"), on November 17, 1987. *See Pidcock v. Sunnyland American, Inc.,* 682 F.Supp. 1563 (S.D.Ga.1987). This Court found that plaintiff had failed to establish causation, an essential element of a cause of action under Rule 10b–5. *See* 682 F.Supp. at 1577–82.

Plaintiff appealed from that judgment to the United States Court of Appeals for the Eleventh Circuit, which reversed the judgment of this Court in favor of defendants and remanded this case for further proceedings. *See Pidcock v. Sunnyland America, Inc.,* 854 F.2d 443, *reh'g denied,* 861 F.2d 1281 (11th Cir.1988). The Court of Appeals upheld this Court's finding that Pidcock had proved three essential elements of a cause of action under Rule 10b–5: (1) materiality, (2) scienter, and (3) reliance. *Id.* at 446. The Court of Appeals reversed this Court's conclusion with respect to causation. *Id.* at 448. On remand this Court must consider the issue of damages, the only issue remaining to be decided. *See generally Pidcock, supra,* 854 F.2d 443.

As outlined in the Eleventh Circuit opinion, Pidcock is entitled to the following presumption: "that the damages he suffered as a result of the fraud [perpetrated by the Harvards] are equal to the profits the Harvards realized upon the sale of Sunnyland to Soparind." *Id.* at 448. This presumption operates to require the Harvards to show that the profits are "attributable to causes other than their fraudulent purchase of Pidcock's interest." *Id.* Pidcock retains the ultimate burden of proof on the issue of damages; however, if the Harvards fail to demonstrate that the profit was attributable to other causes, then Pidcock will prevail on this issue on the

estate.

2. The Court has also determined that oral argument on the issue of damages is not warranted.

3. To the extent that any findings of fact constitute conclusions of law, they are adopted as such. To the extent that any conclusions of law constitute findings of fact, they are so adopted.

strength of this presumption. If the Harvards appear to have met their burden, then Pidcock must convince the Court that the Harvards' explanation should not be accepted. *Id.*

The Court of Appeals directed this Court to make new findings and conclusions consistent with its opinion; however, whether further evidence should be taken was left to this Court's discretion. 854 F.2d at 448. Because this case was already tried before the Court, because the Court had the benefit of hearing the testimony of the various witnesses, and because the documentary evidence and exhibits and the transcript of that trial provide an adequate basis for further findings of fact, the Court has determined that additional proceedings in this matter are unnecessary; however, the Court has had the benefit of briefs from the parties to this action.[2] In accordance with the directives of the Eleventh Circuit, this Court now makes further findings of fact and conclusions of law consistent with the opinion of the Circuit reported at 854 F.2d 443. The Court adopts the findings and conclusions set forth in its Order dated November 16, 1987, and reported at 682 F.Supp. 1563, to the extent that such findings and conclusions are not inconsistent with the opinion of the Eleventh Circuit, as part of its additional findings and conclusions set forth below.[3]

*Findings of Fact*

1. The agreement for redemption by Sunnyland of Pidcock's stock, *see* Exhibit 33, dated December 21, 1982, states that the purchase price for the stock shall be $2,406,305.00, including $2,212,690.00 to be paid by the closing date and a promissory note for $193,615.00 bearing interest at fifteen percent per annum and payable over five years in yearly installments.[4] This

4. In October 1982 Joe Harvard and L.B. Harvard, Jr., met with Pidcock and offered him 2.2 million dollars for his half interest in Sunnyland. The Harvards acknowledged that the figure did not reflect the fair market price of the stock; instead, it was based on what the Harvards claimed they could afford to pay. Pidcock accepted an amount that may have been as little as one third the fair market value of his

agreement was conditioned upon the company obtaining approval of the transaction from the United States Farmers Home Administration.[5]

2. Included in the purchase agreement was a provision indicating that at the time of the closing the parties would enter into several further agreements.[6] One of these was a five-year non-competition agreement. The purchase agreement stated that "as consideration for [this] agreement not to compete" which applied to both Pidcock and his wife, they would be paid $90,000.00 per year for five years from the closing date.

3. At trial Pidcock testified that he had stressed to the Harvards the importance of any information regarding any potential buyer of Sunnyland and the effect such information would have on his willingness to sell his half interest in the company to the Harvards. The Court credits his testimony that, had he known in the fall of 1982 or the spring of 1983 of certain inquiries and the prospects for selling Sunnyland, he would have retained his interest in the company. Transcript at 49 & 56. As Pidcock emphasized at trial, "you would have had to drag me out." Transcript at 96.

4. On March 30, 1983, Sunnyland and John Pidcock closed on the redemption of Pidcock's stock, at which time Sunnyland redeemed Pidcock's 2,500 voting shares and 47,500 non-voting shares, which had constituted his one-half ownership of Sunnyland.[7] As a result of this purchase, L.B. "Dude" Harvard was the owner of all Sunnyland stock on that date except a small portion of Class B shares purchased by the Sunnyland profit sharing plan.

5. The covenant not to compete which was executed at the time of closing included the following clause: "The provisions of this covenant have been separately bargained for. Sellers shall report all sums received hereunder as ordinary income for Federal income tax purposes." The payments of $90,000.00 per year would be due to Pidcock or, in the event of his death before the expiration of the five year period, to his wife; however, if both Pidcock and his wife died before the expiration of the five year period, the payments would terminate.

6. Also to be executed at closing was a consulting agreement listed separately in the purchase agreement and providing for a yearly fee of $10,000.00. In exchange, Pidcock would act "as a professional consultant to the company in matters involving the operation and management of its companies" although the "time and manner of providing such services" would be determined by Pidcock.

7. The consulting agreement further provided that the company would maintain

stock at that time, because of the nature of his share. As Pidcock testified, "[a] fifty percent interest in a company is not valuable really to anyone except the person that has the other fifty percent." He explained that "[i]n other words, I couldn't have found anybody to go out and buy my fifty percent. We couldn't sell the company as a whole, and it was that much, ten times less likely that I would find somebody to buy my fifty percent." Transcript at 43.

5. At the trial the following exchange took place between Evan J. Allen, a financial analyst specializing in valuations, and counsel for the Harvards:

Q. Now, you understand that in this given situation, when Mr. Pidcock was paid, what he was paid was not ... 2,200,00 for his stock. He was paid a larger amount for his interest in the company, and part of it was dedicated to stock, and part of it was dedicated to other things. You understand that; don't you?

. . . . .

A. I understand that when he sold out he received those other items.... But again, if the redemption had not occurred, which is what the assumption is here, it appears that he was getting over a five-year period as shown in here, three-quarters of a Million Dollars in salary, bonus, and life insurance. Transcript at 352–53.

6. These were "corollary" agreements, according to Pidcock. Transcript at 83.

7. There was credible testimony leading the Court to conclude that the fair market value of Sunnyland in the late fall of 1982 was at least 8.9 million dollars; however, the Court recognizes that Pidcock's fifty percent share of Sunnyland would not have been worth anywhere close to half of the total fair market value of Sunnyland. The presumption that Pidcock's damages are equal to half the Harvards' profits on their deal with Soparind must therefore control the issue of damages in this case.

its existing office space in Savannah for Pidcock's use for the five year duration of the agreement, but limited Sunnyland's potential expenditures for that office to $20,000.00 per year. The consulting agreement also provided for medical and life insurance coverage for both Pidcock and his wife.[8] In addition, Pidcock would be permitted the reasonable use of any aircraft owned or leased by Sunnyland America, Inc., during the five year period.[9] In the event of Pidcock's death, the consulting agreement would be terminated except for insurance benefits for Pidcock's wife.

8. At the closing Pidcock purchased the outstanding share of his company car, a Mercedes, for $10,000.00, and his office furniture and fixtures for $10.00. He also resigned as an officer and director of Sunnyland America, Inc.

9. On March 30, 1983, the date on which Pidcock's 2,500 voting shares and 47,500 non-voting shares were redeemed, Sunnyland sold 10,000 shares of the redeemed non-voting stock to Citizens & Southern National Bank as Trustee for the Sunnyland employees Profit Sharing Plan for $469,000.00 in order to finance in part the purchase of Pidcock's shares, and then cancelled the remaining 37,500 non-voting shares and the 2,500 voting shares which had been redeemed. On April 14, 1983, Dude Harvard gave each of his four children 3,000 shares in Sunnyland. At the same time he sold to each of them an additional 3,500 shares of his non-voting stock for the same price per share as that sold to the Trustee.[10]

10. After the resignation of Pidcock, Dude Harvard's sons, L.B. Harvard, Jr.,

and Joseph C. Harvard, operated Sunnyland. During the period leading up to and the period after the resignation of Pidcock, Joseph Harvard served as President and Chief Operating Officer of Sunnyland, while L.B. Harvard, Jr., was Vice President in Charge of Operations. Each received a salary of $94,000.00 during 1983. Dude Harvard was not involved in the day-to-day management of Sunnyland but received a salary of $70,000.00 in 1983.

11. In 1981 and 1982 Sunnyland had suffered its first net yearly losses of $1,900,000.00 and $1,100,000.00, respectively. These losses were due partly to natural market forces, partly to plant construction costs, and partly to poor management on the part of the Harvard sons. By the end of 1982, Sunnyland had apparently adapted to the market forces which caused the prior losses by consolidating operations and closing or selling unprofitable plants such as the Gainesville and Orlando plants. New auditing procedures were instituted leading to more accurate cost and sales information, thereby increasing profitability. A new truck lease agreement was being negotiated in order to reduce substantially transportation costs. Transcript at 177. By the early part of 1983, the better part of plant construction and renovation had been completed, and Sunnyland had more competitive plant facilities by the standards of the industry. Transcript at 152–54. The company appeared to be on the upswing, and by March 1983 Sunnyland's financial projections were favorable.

12. After Pidcock's shares were redeemed, the Harvards, in their capacities as officers of the company, completed a num-

---

**8.** A life insurance policy of one million dollars was transferred to Pidcock, and Sunnyland paid the $50,000.00 premiums for five years.

**9.** The matter of aircraft use was the subject of a separate agreement.

**10.** As of January 9, 1985, the stock ownership of Sunnyland was as follows:

| | | |
|---|---|---|
| Dude Harvard | 2,500 voting | 40% |
| | 21,500 non-voting | |
| Citizens & Southern National Bank | 10,000 non-voting | 16.67% |
| L.B. Harvard, Jr. | 6,500 non-voting | 10.83% |
| Joseph C. Harvard | 6,500 non-voting | 10.83% |
| Ruth Harvard Salter | 6,500 non-voting | 10.83% |
| Nancy Harvard Jones | 6,500 non-voting | 10.83% |
| TOTAL | 60,000 | 100% |

ber of improvements in Sunnyland facilities at a cost of over 1 (one) million dollars. They also completed consolidating several plant operations and accomplished certain operational modifications, and they concluded the change in the leasing arrangement on Sunnyland trucks. The efforts of the Harvards to improve Sunnyland were made in the course of fulfilling their duties as officers of the company.

13. In the late summer and early fall of 1984, Soparind displayed a strong interest in purchasing Sunnyland,[11] and negotiations began between the parties shortly thereafter. Despite Sunnyland's past financial difficulties and marketing weaknesses, Soparind was interested in Sunnyland because of the geographic marketing area, the product line and compatibility, and the potential for financial and marketing growth. Transcript at 461–62. In January, 1985, an agreement was signed for the purchase of Sunnyland by Soparind.

14. The stock purchase agreement, *see* Exhibit 44, lists the aggregate purchase price as $6,500,000.00, subject to certain "contingent consideration."[12] The terms of the sale included $5,000,000.00 in cash at the closing with a conditional amount, up to an additional $3,000,000.00, based in part upon Sunnyland earnings over the following two years. Specifically, this potential

or variable consideration was embodied in the following terms of the sale: (1) a promissory note in the amount of $1,500,000.00 to be held in escrow and to be reduced by any net losses for the ensuing two years, *see* Exhibit 44, Stock Purchase Agreement 2–3; (2) contingent additional consideration of up to another $1,500,000.00, to be equal to $1.50 for each $1.00 of net profits realized by Sunnyland in the first year after the closing, provided that the net profits were at least $625,000.00.[13]

15. In addition, the purchase agreement referred to both a two-year employment and non-competition agreement for Joe C. Harvard providing compensation of $100,300.00 per year, and a ninety-day consulting agreement for L.B. Harvard, Jr., providing compensation of $25,075.00, plus medical insurance and title to a truck. These agreements were embodied in exhibits to the purchase agreement.

16. On April 5, 1985, the agreement was closed, and Soparind paid $5,000,000.00 in cash to the six shareholders of Sunnyland. In the fall of 1986, Soparind and the Harvards negotiated the remaining "contingent consideration" terms of the agreement, and Soparind paid the Harvards an additional $2,300,000.00. This figure was not based upon contract formulas.[14] The

---

11. There were other inquiries regarding Sunnyland stock; however, those are irrelevant to the present inquiry.

12. Joseph C. Harvard testified that Soparind initially offered $7.2 million dollars in cash for Sunnyland but that the Harvards opted instead to take $5 million and other contingency consideration.

13. The agreement reads in part:
[I]f the net Earnings realized by the Company during the year ending December 31, 1985, are at least $625,000, Sellers will be entitled to contingent additional consideration for the Shares ("Continent Consideration") of up to an aggregate of $1,500,000.00 determined as follows: (a) If Net Earnings for the year ending December 31, 1985, are at least $625,000, but less than $750,000, Contingent Consideration shall be equal to the difference between: (i) the product of such Net Earnings times $1.50, less (ii) $300,000; (b) If such Net Earnings are $750,000 or more, Contingent Consideration shall be equal to $1.50 for each $1.00

of Net Earnings up to an aggregate of $1,500,000 of Contingent Consideration.

14. Joseph C. Harvard testified at trial regarding this settlement:
Q. (Mr. Norwood) And did Soparind willingly pay you the amount of the earn out?
A. No, it was contended.
 The Court: Contested, you mean?
A. I mean contested. Excuse me.
Q. (Mr. Norwood) What was finally involved in getting the earn out money from the purchaser?
A. Well, we settled early. We settled, I think, in the Fall of 1986 for an agreed upon amount, of 2.3 Million.
Q. And that encompassed both the earn out and the—
A. It encompassed both the escrow and earn out.
Q. Okay, Was that 2.3 tied directly to the formulas in the contract?

total compensation the Harvard's received for their stock in Sunnyland was $7,300,000.00.

### Conclusions of Law
### The Harvards' Profits

■ 1. In the case of a defrauded seller in an action brought under Rule 10b–5, "[w]here the defrauding purchaser receives more than the seller's actual loss, the damages are the purchaser's profits." *Pidcock v. Sunnyland*, 854 F.2d at 446. Moreover, once the element of fraud has been established, as it was in this case, "any profit subsequently realized by the defrauding purchaser should be deemed the proximate consequence of the fraud." *Id.* (citing with approval *Janigan v. Taylor*, 344 F.2d 781 (1st Cir.) *cert. denied*, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965)).[15]

> A. I don't—
> The Court: Or, was it just an arbitrary give and take?
> A. That's what it ended up being.
> Q. (Mr. Norwood) Was it given to you?
> A. No, it was given. I mean, it was—
> The Court: I mean negotiated without much formula, as I understand.
> Mr. Norwood: Right. Okay.
> A. It was very hard to come by, and we negotiated finally down to that point.
> Q. (Mr. Norwood) All right, sir. At the time that the sale with Soparind was closed, did you have a feeling of great confidence that the additional contingent consideration was in the bag?
> A. No, I didn't have a feeling of great confidence. I sure didn't.
> Transcript at 417–18.

15. The Court notes that this remedy has its roots in earlier forms of equitable relief. *See, e.g., Falk v. Hoffman*, 233 N.Y. 199, 135 N.E. 243 (1922) (Cardozo, J.) (suing in equity, defrauded seller of securities may recover proceeds of the resale, securities and cash, although the price upon resale may be found to be greater than the value at the sale).

16. Pidcock argues that the proper method of calculating profits in this case would be to subtract the amount received by Pidcock for his stock from the amount paid by Soparind for Sunnyland, and reduce that result by the percentage of Sunnyland not previously owned by Pidcock. This is not the method approved in either *Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402, 412 (3d Cir.1973) (50% of final sale less price received by half-owner plaintiff at earlier sale is measure of damages), or *Janigan v. Taylor*, 344 F.2d 781 (1st Cir.1965), *aff'd in relevant part, Taylor v. Janigan*, 230 F.Supp. 858, 859 (D.Mass.1964) (defrauding purchaser must disgorge profits ultimately received on stock originally purchased from defrauded seller). The effect of using Pidcock's proposed method would be to penalize the Harvards by depriving them not only of their profits on their share of Sunnyland but also of the value of their share of Sunnyland at the time of the purchase from Pidcock. The remedy of disgorgement is an exercise of the Court's power in equity, and "[d]isgorgement is remedial and not punitive;" therefore, disgorgement "extends only to the amount with interest by which the defendant[s] profited from [their] wrongdoing." *S.E.C. v. Blatt*, 583 F.2d 1325, 1335 (5th Cir.1978). The value of the Harvards share at the time of the purchase from Pidcock is presumed to be at least the same as the price the Harvards paid for Pidcock's share of Sunnyland. The figure representing the Harvards' initial share must be subtracted from the total before an accurate profit figure can be calculated. The Harvards must disgorge their profit on Pidcock's one-half share of Sunnyland.

17. The Harvards argue that, instead of using a 50% formula to determine Pidcock's share, the Court should use a 40% formula, because 10% of the stock redeemed from Pidcock was sold to C & S National Bank. However, the Harvards sold that portion of Sunnyland stock to C & S in order to finance the purchase of Pidcock's share of Sunnyland. The whole point of the Harvard's purchase of the Pidcock share was to resell it later at a substantial profit. As part of their grand scheme, the Harvards redeemed their own stock to defraud Pidcock of the profit on his half share of Sunnyland, and Pidcock is still entitled to one-half the profits of the total sale to Soparind.

■ 2. The proper measure of damages is the difference between what the Harvards received from Soparind for what had been Pidcock's interest in Sunnyland and what Pidcock received from the Harvards for that interest.[16] *See Rochez Bros. v. Rhoades*, 491 F.2d 402, 412 (3d Cir.1974).

3. In April, 1985, the Harvards received $5,000,000.00 in cash at the closing of the sale of Sunnyland to Soparind. They received an additional $2,300,000.00 in the fall of 1986. All compensation paid pursuant to agreements regarding employment, non-competition and consulting of Joseph C. Harvard and L.B. Harvard, Jr., is not included in the purchase price of Sunnyland. The Harvards received $7,300,000.00 for the sale of Sunnyland to Soparind, and Pidcock's share of that amount should have been one half, $3,650,000.00.[17]

4. The agreement for redemption of Pidcock's stock by the Harvards indicates that the purchase price for Pidcock's half of the company was $2,406,305.00, including a promissory note in the amount of $193,615.00. The covenant not to compete and the consulting agreement executed at the time of the closing of the purchase agreement, although precipitated by the Harvards' purchase of Pidcock's half interest in Sunnyland, constituted separate contracts. These corollary contracts were bargained for separately and were contingent upon Pidcock's living and fulfilling the express terms of those contracts. Any compensation which Pidcock may have received from these separate agreements cannot be included in the purchase price of Pidcock's Sunnyland stock. Nor can other incidental agreements, such as those pertaining to automobiles, office furniture, and the occasional use of company aircraft, be considered as relating to compensation for Pidcock's half interest in Sunnyland.

5. Pidcock's share of the Harvards' profit on the sale of Sunnyland to Soparind is $1,243,695.00. The presumption is that the Harvards must disgorge this profit.[18]

*Cause of the Harvards' Profit*

■ 6. Pidcock is entitled to the benefit of the presumption that his damages are equal to his share of the Harvards' profit on the sale to Soparind, and the Harvards must then "come forward with evidence showing that the profit is attributable to causes other than their fraudulent purchase of Pidcock's interest." *Pidcock, supra,* 854 F.2d at 448. As the Fifth Circuit has explained, "a [defrauded seller] may not recover any portion of the profits attributable to the [defrauding purchasers'] 'special or unique efforts ... other than those for which [they are] duly compensated.'" *Siebel v. Scott,* 725 F.2d 995, 1002

(5th Cir.1984) (quoting *Nelson v. Serwold,* 576 F.2d 1332, 1338 n. 3 (9th Cir.1978) and cited in *Pidcock, supra,* 854 F.2d at 448.).

■ 7. From the time of the Harvards' purchase of Pidcock's interest in Sunnyland until the time of the sale of Sunnyland to Soparind, the Harvards were employed in compensated corporate capacities, as officers or directors. The record indicates that the Harvards were well compensated for their positions as officers and directors of Sunnyland. Any special efforts which would serve to limit the profit in this case must be confined to any special efforts which the Harvards can demonstrate took place outside or beyond "the regular duties for which they were paid." *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402, 412 (3d Cir.1974). The burden is on the Harvards to come forward with such evidence. *Pidcock, supra,* 854 F.2d at 448.

8. The Harvards argue that the additional $2,300,000.00 paid by Soparind to them in the fall of 1986 should not be included in the purchase price of Sunnyland because it was received as the result of "hard negotiations" and that they were the "risk-takers" with respect to this "contingent consideration." The Court rejects their arguments with respect to this "contingent consideration." Every purchase of securities not accomplished through a national or international exchange is "negotiated" in one way or another, and a certain element of risk is inherent in the purchase and sale of securities. These cannot constitute special efforts as envisioned by the Eleventh Circuit. *Pidcock,* 854 F.2d 447–48. Neither the risk nor the subsequent negotiations associated with the Soparind purchase fall within the special efforts exception of *Janigan v. Taylor,* 344 F.2d 781, 787 (1st Cir.) *cert. denied,* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1968).[19]

---

**18.** The Harvards argue that the Court should use the time value of the funds paid to Pidcock in any calculation of profits. The Harvards admit that they can find no authority for this proposition, but rely on the Court's sense of fairness. In essence, the Harvards argue in favor of a misapplication of the time value theory. The Court can discern no reason to extend to a defrauding purchaser this sort of credit for

interest on funds it expended in order to swindle the seller. *See Thomas v. Duralite Co., Inc.,* 524 F.2d 577, 588 N. 7 (3d Cir.1975) (affirming district court's rejection of a discount to present worth calculation with respect to damages).

**19.** The Harvards provide no other authority for their assertion that the $2.3 million should not be included in the purchase price. Moreover,

9. The Harvards argue that because their compensation was not tied directly to any improvement in the attractiveness of Sunnyland to any potential purchaser, and because they did not receive any bonus based on profits, their "extraordinary efforts" on behalf of Sunnyland were not otherwise compensated. They rely on *Thomas v. Duralite Co., Inc.,* 524 F.2d 577, 587–88 (3d Cir.1975), for the proposition that extraordinary efforts deserve an allowance in mitigation of disgorgement. In *Thomas,* however, it was the disparity of valuations estimated before and after the initial fraudulent purchase, as well as the "personal worth" of the defrauding purchasers to the subsequent purchasers that the court emphasized as bringing the case within the special efforts exception. *Id.* at 588.

10. There are no such circumstances in the case *sub judice* to warrant crediting the Harvards with any special efforts. There was no dramatic increase in the value of Sunnyland as a result of the Harvards' purchase of Pidcock's share, nor does the record indicate that the Harvards embodied any "personal worth" of the sort referred to in *Thomas.* Moreover, there was credible testimony that the Harvards had almost mismanaged the company during part of their tenure as officers.

11. The record indicates that the many accomplishments listed by the Harvards as comprising special efforts were projected or accomplished in whole or in part before their purchase of Pidcock's stock in Sunnyland. For example, this is certainly true with respect to the abolition of "redundant efforts in sales, accounting and slaughtering facilities" to which the Harvards point. Transcript at 490–91. Plants at Gainesville and Orlando, Florida, were closed before 1983. The sale of certain assets of Sunnyland, including assets of Roberts Packing Co. and Georgia Packing Co., was arranged before March 30, 1983. Exhibit 31 at 2; Exhibit 49 at 14. The Dothan, Alabama, beef division was closed in 1981, and a decision to sell the plant was made in 1982. Exhibit 49 at 14. New equipment had been purchased before 1983, and the renovations which the Harvards claim were their innovations had been contemplated, projected, or charted before their undivided ownership in Sunnyland.[20] Joseph C. Harvard testified that plant consolidations had been an ongoing program at Sunnyland since the mid–1970s, and the Ryder Truck lease was being negotiated before 1983. Even if they fell exclusively within the period during which the Harvards owned all of Sunnyland, these efforts would not fall under the "special effort" exception to the disgorgement doctrine. The Harvards should have been undertaking these sorts of efforts within the scope of their duties as officers and directors of Sunnyland.

12. The Court also notes that the price which Soparind paid the Harvards for Sunnyland in 1985 was lower than the fair market value of Sunnyland in 1983.

13. The Harvards did not bring to their management or development of Sunnyland the sort of "entrepreneurship" necessary to trigger the "special or unique efforts" exception to the disgorgement doctrine. *Siebel v. Scott,* 725 F.2d 995, 1002 (5th Cir.1984). *See also Thomas v. Duralite Co., Inc.,* 524 F.2d 577, 587–88 (3d Cir. 1975), *Janigan v. Taylor,* 344 F.2d 781 787 (1st Cir.) *cert. denied,* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965). They did not introduce new lines of business which might trigger such an exception. Nor did they extend personal guaranties on bank loans *for working capital* sufficient to escape disgorgement. *See Myzel v. Fields,* 386 F.2d 718, 747 (8th Cir.1967), *cert. de-*

---

their argument in regard to the exceptional risk involved in this transaction is particularly suspect in light of Soparind's initial offer of $7.2 million.

**20.** Any efforts of the Harvards with respect to modernization of Sunnyland would not fall under the special efforts exception to the doctrine of disgorgement. *See Nelson v. Serwold,* 576 F.2d 1332, 1338 n. 3 (9th Cir.) (defendant's efforts toward modernization fell within compensated corporate capacities), *cert. denied,* 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978).

*nied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968).

14. According to the Eleventh Circuit, "the mere passage of time, if long enough, may limit the amount of profits recoverable by a previously defrauded seller," *Pidcock, supra,* 854 F.2d at 447. The passage of time does not affect the remedy of disgorgement in this case. The Court finds that, if apprised of the information that the Harvards fraudulently withheld from him, Pidcock would have retained his half ownership in Sunnyland. Furthermore, the Harvards' management of the company tended to negate any positive effects of the passage of time. *See Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1305–06 (2d Cir.1973) (nine years were sufficient to limit profits).

15. Any increase in the value of Sunnyland can be attributed to efforts undertaken by the Harvards withing their compensated capacities, to natural commercial growth or to market forces beyond the control of the Harvards. The Harvards' profits can be attributed to their fraudulent purchase of Pidcock's share of Sunnyland.

 16. Pidcock is entitled to his share of the Harvards' profits, $1,243,-695.00, together with prejudgment interest[21] at the rate of 7% (seven percent) per annum, not compounded, from April 5, 1985, until the date of entry of judgment.

*Conclusion*

For the foregoing reasons, judgment is entered in favor of plaintiff and against defendants in the amount of $1,243,695.00 together with prejudgment interest.

SO ORDERED.

## ON MOTION FOR NEW TRIAL

In an Order entered February 8, 1989 ("February Order"), the Court addressed the issue of damages in this case and entered judgment in favor of plaintiff and against defendants in the amount of $1,243,695.00 together with prejudgment interest.[1] Before the Court are the motions of defendants for a new trial on the issue of damages, for amendment of the findings in its February Order, for amendment of the judgment, and for a stay of execution and a continuance of the taxation of costs pending disposition of post-trial motions.[2] After hearing the arguments of counsel and reviewing the record, the Court has reconsidered its February Order and, for reasons developed below, MODIFIES the judgment.

## I. MOTION FOR NEW TRIAL AND AMENDMENT OF FINDINGS

 Defendants have moved for a new trial on the issue of damages pursuant to Rule 52(b) of the Federal Rules of Civil

---

**21.** An award of prejudgment interest is not a penalty; it compensates plaintiff for the use of his funds. *Chung, Yong Il v. Overseas Navigation Co., Ltd.,* 774 F.2d 1043, 1057 (11th Cir. 1985). *See also West Virginia v. United States,* 479 U.S. 305, 310 n. 2, 107 S.Ct. 702, 706 n. 2, 93 L.Ed.2d 639 (1987). It is established that whether "prejudgment interest should be awarded on a damage recovery in a [federal securities] action is a question of fairness resting within the District Court's sound discretion." *Wolf v. Frank,* 477 F.2d 467, 479 (5th Cir.), *cert. denied,* 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973). However, in awarding prejudgment interest, "the district court must insure that the award is not punitive in nature." *Osterneck v. E.T. Barwick Industries, Inc.,* 825 F.2d 1521, 1536 (11th Cir.1987). As to the award of prejudgment interest in the present case, the Harvards have had use of funds belonging to Pidcock. Fairness requires that the Harvards compensate Pidcock for the use of his funds. To

insure that the interest award is not punitive in nature, the Court has chosen a rate of interest to allow for "the smallest interest award." *Id.* There are no factors present indicating that a reduction of this award is in order.

**1.** In the February Order, the Court recounted the procedural history of this case and supplemented its earlier findings of fact and conclusions of law with further findings and conclusions with respect to damages. The Court reiterates its earlier findings of fact and conclusions of law to the extent that they are consistent with the present Order. For background on this action, see the February Order.

**2.** Plaintiff also moved for an Order requiring the posting of a bond. At the hearing on March 28th, the parties indicated that they had reached an agreement as to appropriate security and that they would be able to arrange it without any intervention on the part of the Court.

Procedure[3] and for amendment of the Court's findings in its February Order. Courts have distilled three major grounds justifying reconsideration: an intervening change in controlling law, the availability of new evidence, and the need to correct clear error or prevent manifest injustice. *See, e.g., Major v. Benton,* 647 F.2d 110, 112 (10th Cir.1981); *Natural Resources Defense Council, Inc. v. United States Environmental Protection Agency,* 705 F.Supp. 698 (D.D.C.1989); *All Hawaii Tours v. Polynesian Culture Center,* 116 F.R.D. 645, 649 (D.Hawaii 1987); *Kern–Tulare Water Dist. v. City of Bakersfield,* 634 F.Supp. 656, 665 (E.D.Cal.1986); *Evans, Inc. v. Tiffany & Co.,* 416 F.Supp. 224, 244 (N.D.Ill.1976). Indeed, a party may move to amend the findings of fact even if the modified or additional findings effectively reverse the judgment. Essentially, if the Court "has entered an erroneous judgment, it should correct it." 5A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 52.11[2] (2d ed.1985).

### A. *New Trial*

Defendants argue that the February Order was entered in violation of their right to introduce, on remand, further evidence on the issue of damages. They claim that, pursuant to Rule 59 of the Federal Rules of Civil Procedure, the Court must now afford them a new trial on damages. Although Rule 59 does not enumerate all the various grounds for a new trial, the usual grounds applicable to jury trials are not relevant here. In general, however, "[t]he court has the power and duty to order a new trial whenever, in its judgment, this action is required in order to prevent injustice." 11

Wright & Miller, *Federal Practice and Procedure* § 2805 (1973).

There was a full trial of all issues in the first round of this litigation, and the parties were not precluded from presenting any evidence relating to damages. After trial, the Court found against plaintiff and in favor of defendants as to liability and therefore entered no findings of fact or conclusions of law with respect to damages. *See generally Pidcock v. Sunnyland America, Inc.,* 682 F.Supp. 1563 (S.D. Ga.1987). The Court of Appeals for the Eleventh Circuit reversed this Court's Order, finding that plaintiff was entitled to a presumption that the Harvards' fraud was the proximate cause of any subsequent profit derived by the Harvards from Pidcock's share in Sunnyland, *see Pidcock v. Sunnyland America, Inc.,* 854 F.2d 443, *reh'g denied,* 861 F.2d 1281 (11th Cir.1988), and remanded the case for consideration of the issue of damages.[4]

Defendants do not claim that there is any newly discovered evidence. Instead, they argue that the opinion of the Eleventh Circuit created a new burden, requiring defendants "to come forward with evidence showing that their profit is attributable to causes other than their fraudulent purchase of Pidcock's interest." 854 F.2d at 448. While reversing this Court's judgment, and allowing plaintiff the benefit of a presumption that his damages are equal to the Harvards' profits, the Eleventh Circuit did not reverse as to damages because there had been no previous findings or conclusions respecting damages. The Eleventh Circuit opinion did not embody a change in the controlling law. Plaintiff always retained the burden of proof as to

---

**3.** Under *Fed.R.Civ.P.* 52(b), a party may petition the Court to amend its findings within ten days of the entry of judgment.

**4.** The Eleventh Circuit directed this Court to make new findings and conclusions consistent with its opinion and left to this Court's discretion the question as to whether further evidence should be taken. The Eleventh Circuit did not require a new trial. Because the case had already been tried, because the Court had the benefit of hearing the testimony of various wit-

nesses, and because the documentary evidence and exhibits and the transcript of that trial provided an adequate basis for further findings of fact, the Court determined that additional hearings on the issue of damages were unnecessary. Although the Court entered an Order indicating that no further evidentiary hearings would be held and that no new evidence would be considered, the Court invited the parties to brief the issue of damages, and the parties submitted extensive memoranda and briefs.

both liability and damages.[5]

As a general rule, a motion to amend or for a new trial should not be "employed to introduce evidence that was available at trial but was not proffered, to relitigate old issues, to advance new theories, or to secure a rehearing on the merits." *Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207, 1219 (5th Cir.1986). "Blessed with the acuity of hindsight, [defendants] may now realize that [they] did not make [their] initial case [as to damages] as compelling as [they] might have, but they cannot charge [this Court] with responsibility for that failure." *Id.,* 791 F.2d at 1220. Because defendants offer no newly discovered evidence and can point to no change in the controlling law, they have no legitimate claim to a new trial.

### B. *Error in Calculating Damages*

A motion for reconsideration may also be brought on the basis of judicial mistake. *See, e.g., A.D. Weiss Lithograph Co. v. Illinois Adhesive Products Co.,* 705 F.2d 249, 250 (7th Cir.1983); *Liberty Mutual Insurance Co. v. E.E.O.C.,* 691 F.2d 438, 441 (9th Cir.1982). In the February Order, the Court assumed that Pidcock was entitled to recover his share of the profits the Harvards received from the sale of Sunnyland to Soparind. The Court calculated those profits by subtracting the amount paid to Pidcock for his half share and the value of the Harvards' share of Sunnyland at the time of the fraudulent transaction from the amount paid by Soparind for Sunnyland. The resulting figure represented the Harvards' profits on the sale to Soparind, and that figure was divided in half to determine Pidcock's share of those profits.

### 1. The Profit Sharing Plan's Interest in Sunnyland

Defendants argue that the Court failed to consider that at the time of Soparind's purchase of Sunnyland, the Citizens & Southern National Bank owned a substantial portion of Sunnyland stock, and that therefore the Court's damage award was too high. In the February Order, the Court found that when Pidcock sold the 2,500 voting shares and 47,500 non-voting shares which constituted his half-share in the company for $2,406,305.00 to Sunnyland, defendants immediately afterward completed the sale of 10,000 non-voting shares of Sunnyland to Citizens & Southern National Bank as Trustee for the Sunnyland Employees Profit Sharing Plan ("Plan") for $469,000.00. February Order at 7–8.

The Court also found that in 1985 Soparind paid $5,000,000.00 "to six shareholders of Sunnyland" and in 1986 paid an additional $2,300,000.00 to the Harvards. February Order at 11. One of the six shareholders of Sunnyland was the Citizens & Southern National Bank as Trustee for the Plan. The bank held 16.67% of Sunnyland stock as of January 9, 1985. Implicit in both the Order of November 17, 1987, and the February Order is the finding that the Harvards received 7.3 million dollars for Sunnyland.[6] Upon reconsideration the Court concludes that this finding was erroneous.

Several factors related to the Plan transactions are particularly significant. The Harvards used the sale of Sunnyland

---

5. The Eleventh Circuit explained that "the district court failed to consider a line of securities cases providing that where a defrauding purchaser obtains a profit, the defrauded seller may be able to recover that profit as damages." 854 F.2d at 443. Regardless of its holding with respect to causation, the Circuit implied that the law of damages under section 10b–5 was established, and that in enunciating the relevant law on damages, it was not creating a new burden. Whether or not the parties were aware of their respective burdens at trial is another matter entirely and of no legal consequence. If either party failed to present adequate evidence as to a particular issue at trial, the Court is not obligated to hold additional evidentiary hearings. The fact that the Court did not rule on damages in its original Order does not entitle the Harvards to a new trial on that issue when there exists an adequate record. It is true that at the trial in 1987 neither plaintiff nor defendants presented much evidence relating to damages; they presented sufficient evidence, however, for the Court to determine that there were damages.

6. In its Order of November 17, 1987, the Court found that "[u]ltimately, the Harvards received, in total, 7.3 million dollars for Sunnyland." 682 F.Supp. at 1572.

stock to the Plan to finance in part their fraud. While the $469,000.00 was paid to Sunnyland, the Harvards benefitted from that transaction only insofar as they used that money in financing the company's purchase of Pidcock's half of Sunnyland. The Plan made an independent determination of the appropriateness of investing in Sunnyland, and control of the Plan's Sunnyland stock remained with the Plan Trustee. The profits from the sale of the Plan's Sunnyland stock to Soparind accrued to the Plan.[7] The Plan was an innocent party in this scenario. It is well established that "[d]isgorgement is remedial and not punitive. The Court's power to order disgorgement extends only to the amount with interest by which a defendant profited from his wrongdoing. Any further sum would constitute a penalty assessment." *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir.1978). *See also SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 102 (2d Cir.1978) (disgorgement is method of forcing defendant to give up amount by which he was unjustly enriched); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir.1972) (defendant can be compelled to disgorge only profits and interest wrongfully obtained).

Generally, defrauding purchasers should not be made to disgorge profits that accrued to one who did not participate in the fraud, *Nelson v. Serwold*, 687 F.2d 278, 281 (9th Cir.1982) (profits gained by others who are not wrongdoers not recoverable), and so when innocent persons also realize a profit on the fraudulent transaction, their profits are not included in calculating a damage award based on disgorgement. *Id.* at 281. As the court in *SEC v. Blatt* noted, "[t]he purpose of disgorgement is *not to*

compensate the victims of the fraud, but to deprive the wrongdoer of his ill-gotten gain." 583 F.2d at 1335 (emphasis added) (citing *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 102 (2d Cir. 1978)). The Harvards therefore "should not be made to disgorge the profit from the sale of the stock owned by [the Plan] because they did not benefit from that profit." *Id.*

The profits from the sale of the Plan's share of Sunnyland to Soparind did not accrue to the Harvards. The record reveals that $1,216,666.68 of the 5 million dollars paid for Sunnyland in 1985 and the 2.3 million dollars paid in 1986 never went to the defendants but instead went to the Plan.[8] On April 5, 1985, Soparind purchased Sunnyland stock from the Plan for $833,333.34, and on October 16, 1986, Soparind made an additional payment of $383,-333.34 to the Plan. Because these amounts were never paid to the Harvards, the Court must adjust the damage award by subtracting the $1,216,666.68 paid to the Plan from the 7.3 million dollars paid by Soparind. Only $6,083,333.32 was actually paid to the Harvards.

The Plan's initial payment of $469,000.00 to Sunnyland for 16.67% of the company on March 30, 1983, has no significance in determining the Harvards' profits. Although in calculating those profits the Court must subtract the amount paid by Soparind to the Plan, the amount that the Plan initially paid to Sunnyland for the stock does not figure into a calculation of damages under the disgorgement remedy mandated by the Eleventh Circuit. The Court must base its determination of the Harvards' profits on the amount actually paid to the Harvards, and the $469,000.00 was paid to the compa-

7. Concerned that the only beneficiaries of the Plan might have been the Harvards, the Court requested information from the parties in order to determine whether the funds paid by Soparind to the Plan were ultimately transferred to the Harvards as Plan participants. It appears that in 1983 the Plan had 1200 participants; in 1985, there were 724 participants; and in 1986 there were 632 participants. The Harvards and Pidcock remained beneficiaries of the Plan after the Soparind sale. The Court understands that the parties thus eventually received a very small percentage of the proceeds from the Soparind

sale through their participation in the Plan. The Court, however, will not speculate as to the precise amount the parties recovered from the Soparind sale as Plan beneficiaries and will not consider such proceeds in determining damages.

8. Defendants claim that one fifth of the purchase price was paid to the Plan, but it is not apparent how defendants arrived at that percentage.

ny and not to the Harvards.[9] Although the $469,000.00 paid by the Plan increased the value of the assets of Sunnyland, such an increase, like any increase in assets, would have been realized by the Harvards as stockholders at the time of the subsequent sale to Soparind.[10]

2. The Harvards' Alleged "Credit"

▉ Defendants argue that when the Court determined the profits realized by the Harvards on the sale of the Harvards' *own* half share of Sunnyland to Soparind, the Harvards were entitled to a credit in an amount equal to what Pidcock was paid for his shares in Sunnyland, $2,406,305.00.[11] The value of the Harvards' share of the company is relevant to the question of their profits on the sale of Sunnyland to Soparind. The Harvards' total profits would be equal to the amount they received from Soparind for their Sunnyland stock, less the value of their half share of Sunnyland at the time of the fraudulent transaction, and less any funds they actually paid to Pidcock.[12] The Court sees no basis in the record, however, for concluding that the Harvards' half share of Sunnyland was worth more than what they paid Pidcock for his half share. The evidence established that there was little market for a half share in Sunnyland at the time Pidcock

sold his share. Although valuing a half share in a closely held corporation can be difficult, the Court has determined that the price actually paid by the Harvards for Pidcock's half share best indicates what a half share of Sunnyland was worth on the date of the fraudulent transaction.

3. Time Value of Funds Paid to Pidcock

Defendants assert that they are entitled to a setoff based upon Pidcock's use of the $2,406,305.00 he was paid on March 30, 1983. Defendants rely upon general law of equity and restitution and maintain that "the object of restitution is to return the parties to the position that existed before the transaction occurred," which will usually involve "awarding interest *on money that is to be returned,* at the legal rate, from the date of receipt." *In re First Penn Corp.,* 793 F.2d 270, 272 (10th Cir. 1986) (emphasis added). Defendants argue that Pidcock had the use of money that belonged rightfully to the Harvards, but this is clearly not so. These funds were not going to be returned to the Harvards. The funds belonged to Pidcock and the Court will not charge Pidcock interest on money that belonged to him.

4. Plaintiff's Disgorgement Formula

In response to defendants' motion for reconsideration, plaintiff also maintains

---

**9.** The Plan purchase benefited defendants in that it allowed them to establish control of the company and ownership of a great majority of the stock. Nevertheless, the proceeds from the Plan purchase were paid to Sunnyland and not to the Harvards.

**10.** Plaintiff argues that the Court should ignore the Plan transactions and look only to the 7.3 million dollar Soparind purchase. Plaintiff looks to *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402 (3d Cir.1974) (*Rochez I*), for the principle that in determining the amount to be disgorged, all post-fraud transactions are to be ignored. This is a baffling characterization of *Rochez I,* and the Court simply notes that the Soparind purchase was also a post-fraud transaction. The Court is concerned with determining the amount of the funds that were actually paid to the Harvards, not those that were paid to others.

**11.** For further discussion of this issue, see the February Order at 13 n. 17.

**12.** The Circuit indicated that the Harvards should be made to disgorge "any profit [they]

subsequently received," and the Circuit opinion did not distinguish between profit the Harvards made on Pidcock's half of the company or profit they made on their own half. The Court has not required the Harvards to disgorge their full profit from the Soparind sale. Although there is limited authority for the proposition that such disgorgement of any profit associated with the fraud may be appropriate under certain circumstances, *see, e.g., Rowe v. Maremont Corp.,* 850 F.2d 1226, 1240–42 (7th Cir.1988), that is not the prevailing view, and the Court does not believe such a remedy is appropriate under the facts of this case. "Equity requires only that a defendant give up its *unjust* enrichment." *Id.* at 1241. Moreover, the parties have urged the Court that the Harvards must disgorge only their profit on Pidcock's share of Sunnyland. Plaintiff has neither argued nor demonstrated that the Harvards must disgorge all profits derived from the sale to Soparind, and plaintiff retains the burden of proof as to damages. 854 F.2d at 448. "The Court's function is to fashion the remedy best suited to the harm." *Arrington v. Merrill Lynch, Pierce, Fenner & Smith,* 651 F.2d 615, 621 (9th Cir.1981).

that the Court miscalculated damages. Plaintiff argues that the Court should subtract the amount paid to Pidcock in 1983, $2,406,305.00, from the total amount paid for Sunnyland by Soparind in 1985, $7,300,000.00, and divide the remainder in half to determine the Harvards' profits, $2,446,849.50. That figure, however, does not take into account that the value of the Harvards' share of Sunnyland was presumed to be the same as what Pidcock was paid for his share, and that the value of the Harvards' share must be entered into the formula to determine the Harvards' profits. Furthermore, such a method of calculation does not take into account that $1,216,666.68 of the proceeds from the Soparind purchase were paid to the Plan.

Plaintiff argues that his method of calculation would bring the parties into parity and that equity requires that the parties receive precisely the same amount of money. In fact, because $1,216,666.68 of the 7.3 million dollars was paid to the Plan, plaintiff's method would not bring the parties into parity. Furthermore, this argument distorts the nature of the remedy in the present case. In cases where actual damages are to be awarded, "the damages shall be the result of the injury alleged and proved, and the ... amount awarded shall be precisely commensurate with the injury suffered." *Osofsky v. Zipf*, 645 F.2d 107 (2d Cir.1981) (quoting *Birdsall v. Coolidge*, 93 U.S. 64, 23 L.Ed. 802 (1876)). In the present case, however, the measure of damages is not the injury suffered or loss sustained by the plaintiff. Rather, the damages are the subsequent profits the Harvards made on the stock they purchased from Pidcock. The proper inquiry, therefore, is not how best to divide all the money received by all parties from the Soparind sale so that the Harvards and Pidcock receive exactly the same amount of money; instead, the Court must determine the profit received *by the Harvards* on Pidcock's share of Sunnyland.[13] The Eleventh Circuit stated that "any profit subsequently *received by the defrauding purchaser* should be deemed the proximate consequence of the fraud." 854 F.2d at 446 (emphasis added).[14] *See also SEC v. Blatt*, 583 F.2d at 1335; *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d at 102; *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d at 1082. The Harvards must disgorge only the profit they made on Pidcock's stock.

---

13. Plaintiff argues that the definition of profits must include all profits made, not merely those made by defendant. This distorts the Circuit's emphasis on the *defendants'* profits as opposed to all profits. *See also Rochez I*, 491 F.2d at 412 (district court erred when it refused to compute damages on the basis of the value the defrauding purchaser *received*).

14. The Eleventh Circuit set out the general law of damages in the case of a defrauded seller as follows: "the general measure of damages for defrauded sellers is the difference between what the seller received and what the seller would have received had there been no fraudulent conduct." 854 F.2d at 446 (citations omitted). Plaintiff argues that he should recover what he would regard as actual losses or total potential profits. "Where the defrauding purchaser receives more than the seller's actual loss, however, the damages are the purchaser's profits." 854 F.2d at 446 (citations omitted). The mandate from the Eleventh Circuit allowed only for disgorgement of the defrauding purchaser's profits.

This Court found that plaintiff failed to prove loss causation, and the Eleventh Circuit did not reverse this Court on that issue. The Eleventh Circuit found, however, that this Court erred in failing to consider the disgorgement remedy, and held that plaintiff was entitled to a presumption that his damages equalled the Harvards' profits. The Eleventh Circuit implicitly distinguished this case from those in which there is a finding of direct causation as to actual losses. The Eleventh Circuit did not direct this Court to apply the general law of damages in this case. Rather, the Eleventh Circuit bypassed the usual remedy of actual damages and limited Pidcock's remedy to disgorgement of the profits received by the Harvards on Pidcock's stock.

The cases from other circuits, such as the *Janigan* case, cited by the Eleventh Circuit in its opinion do not distinguish between those situations involving a defrauded seller in which there was a finding of causation and those situations in which there was no finding of causation but in which causation would be presumed on the basis of the purchaser's subsequent profits. *Janigan* and its progeny involve situations in which the actual loss which flowed from the fraudulent conduct was exceeded by the profits ultimately—perhaps even remotely—received by the defrauding purchaser, hence the appropriateness of disgorgement of those profits. Unlike those other cases, in *Pidcock* there was no finding of direct causation.

In the alternative plaintiff argues that it was Sunnyland and not the Harvards that paid Pidcock for his stock and that therefore the Harvards are not entitled to a deduction from their profits for the $2,406,-305.00 paid to Pidcock. Plaintiff points to the disgorgement formula enunciated in *Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402 (1974) (*Rochez I*), approved by the Eleventh Circuit, and upon which this Court relied in its February Order. *Rochez I* views the appropriate measure of damages as the difference between the value of plaintiff's share of the stock on the basis of the subsequent purchase price and the amount plaintiff received *from defendant* for the stock. *Id.* at 412. Plaintiff points to the language "received from" defendants and argues that he received funds from the company but no funds from the Harvards.

At trial the following exchange took place between plaintiff's counsel and Joe Harvard:

Counsel: [Y]ou didn't use any personal money to buy out Mr. Pidcock; did you?

A: Me, personally?

Q: Or Bryant:

A: Neither one of us had any to speak of.

Q: Or your father?

A: We have personal money with Harvard Enterprise.

Q: You made a loan?

A: Yes.

Q: That was a loan?

A: It was a loan to the company of our personal money.

Q: I understand. But you received, I think, prime interest on the money?

A: Yes.

Q: That was loaned?

A: Yes.

Q: Did you ever make an effort to go to the bank to seek any financing to help fund the purchase?

A: No.

Transcript, Vol. I., at 197–98. The Harvards loaned money to the company so that the company could redeem Pidcock's stock. Any money the Harvards contributed to the Sunnyland purchase effort was returned to them with interest. Although Sunnyland is named as a defendant in this suit, there is no evidence in the record that Sunnyland profited from these transactions. Therefore, the limitations of the disgorgement remedy do not warrant the Court including in any damage calculation funds paid by Sunnyland to Pidcock.

██ Any amount actually paid by the Harvards, however, would be relevant to disgorgement. As the Court has noted, the purpose of disgorgement is to force "a defendant to give up the amount by which he was unjustly enriched" rather than to compensate the victim of the fraud. *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 102 (2d Cir.1978). *See also Randall v. Loftsgaarden*, 478 U.S. 647, 663, 106 S.Ct. 3143, 3152, 92 L.Ed.2d 525 (1986); *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir.1978); *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1241 (7th Cir.1988); *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir.1985). If the Harvards did not use their own funds to purchase Pidcock's stock, this would have a direct bearing on the extent of their enrichment. In the February Order the Court found, and now reiterates its finding, that Sunnyland purchased Pidcock's stock. Any amount paid to Pidcock by the company is irrelevant to a calculation of the Harvards' profits on Pidcock's share of Sunnyland.[15]

\* \* \* \* \* \*

In short, the proper method of calculating the Harvards' profits on Pidcock's

---

15. Although hiding behind the company in their efforts to defraud plaintiff, defendants are not entitled to a credit for any of the funds paid to Pidcock. Depletion of the assets of the company affected the financial condition of the company, but that was reflected in the subsequent sale to Soparind. The Harvards' financial condition, at least in theory, remained unchanged as a result of the fraudulent transaction. Acknowledging that the full company was worth more than the value of two half shares, the Court notes that on the basis of the evidence, immediately after the fraudulent transaction the company was worth $2,406,305.00 less than when it was jointly owned by the Harvards and Pidcock.

share of Sunnyland is as follows: the amount of money the Harvards actually received from any post-fraud transactions involving Sunnyland stock must be reduced by any money they actually paid for Pidcock's share and by the value of the Harvards' share of Sunnyland at the time of the fraudulent transaction. Because the Harvards paid no money of their own for Pidcock's stock, the value of the Harvards' share of Sunnyland at the time of the fraud must be subtracted from $6,083,333.32, the amount the Harvards actually received for their Soparind stock. The remaining figure represents their total profits on the Soparind sale. Their total profits must then be divided in half to determine Pidcock's share.

## II. THE COMPANY AND JOE HARVARD AS DEFENDANTS

Neither the February Order nor the Order of November 17, 1987, addressed one issue raised for the first time in the motion for reconsideration and amendment of the judgment: whether Sunnyland America, Inc. and Joe Harvard in his individual capacity can be held liable in this action.[16]

### A. *Sunnyland's Liability*

 Because the Harvards acted in their capacities as Sunnyland officers, and because Sunnyland purchased Pidcock's shares and had notice of the Harvards' fraudulent activity, Sunnyland cannot escape liability. Dude Harvard, of course,

was the central actor in the fraudulent scheme and a central figure in the operation of the company.

Sunnyland cannot be held liable under § 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78t(a), because the corporation was not the controlling person;[17] Dude Harvard would be the controlling person under § 20(a). *See G.A. Thompson & Co., Inc. v. Partridge,* 636 F.2d 945 (5th Cir.1981); *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 891 (3d Cir.1975) (*Rochez II*). The former Fifth Circuit, however, has held that § 29(a) does not supplant or exclude common law principles of agency, and particularly the doctrine of respondeat superior, in an action brought under the 1934 Act. *Paul F. Newton & Co. v. Texas Commerce,* 630 F.2d 1111, 1118–19 (5th Cir.1980). The court in *Newton* emphasized that "[t]he familiar requirements of agency that the agent act within the course and scope of his employment and that he act within his actual or apparent authority serve to restrict the scope of the principal's liability." *Id.* at 1119. The company in fact purchased Pidcock's stock, and Dude Harvard could be said to have acted in his corporate capacity in directing the company to make the purchase. The three Harvards managed the company. There is an adequate basis in the record to support the conclusion that Dude Harvard acted as an agent of Sunny-

**16.** At oral argument defendants stated that the Estate of L.B. Harvard stands prepared to pay the judgment.

**17.** Section 20(a) provides that:
Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce that act or acts constituting the violation or cause of action.
15 U.S.C. § 78t(a). In *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880 (3d Cir.1975) (*Rochez II*), the Third Circuit was faced with a factual scenario similar to the one in the case *sub judice:* defendant Rhoades was an officer and fifty percent shareholder of MS & R who withheld mate-

rial information from plaintiff Rochez, another officer and fifty percent shareholder, in order to defraud Rochez of his share in MS & R. The court held that Rhoades, and not MS & R, was the controlling person. "Rhoades was Chairman of the board, chief executive officer and President of MS & R and owned fifty percent of the issued and outstanding stock. Rhoades ran the day-to-day business activities of MS & R and obviously had the power to influence the policies and actions of MS & R. Rochez's argument that MS & R is a 'controlling person' must therefore fail because Rhoades and MS & R cannot simultaneously be 'controlling persons' as to each other." *Id.* at 891. Of course, in *Rochez II* the Third Circuit also held that agency principles are not applicable to determine secondary liability in a securities violation case. The rule in this circuit is that such principles may apply in actions brought under the securities laws.

land when defrauding Pidcock of his share of Sunnyland.[18]

There is no indication from the record that Sunnyland reaped any profit as a result of the fraudulent purchase of Pidcock's Sunnyland stock. Because disgorgement has been designated the appropriate remedy in this case, and because that remedy involves a party returning subsequent profits *it actually made* as a result of the fraud, Sunnyland cannot be made to disgorge what it never had.

### B. *Joe Harvard's Liability*

■ Plaintiff argues that Joe Harvard may be held liable in his individual capacity as an aider and abettor of alleged securities violations.[19] In order for one to be held liable as an aider and abettor under the securities laws, three elements must be satisfied: (1) some other party committed a securities law violation, (2) the accused had general awareness of his role in the improper activity, and (3) the accused knowingly and substantially assisted the violation. *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir.1975). *See also Schneberger v. Wheeler*, 859 F.2d 1477, 1480 (11th Cir.1988) (following *Woodward*).

■ Based on the Order of November 17, 1987, and the Eleventh Circuit opinion, there can be little doubt that Joe Harvard can be held liable as an aider and abettor. Indeed, defendants do not seriously contest this. Rather, they argue that Joe Harvard cannot be held liable for the full judgment but only to the extent that he personally benefitted from the fraud. They argue

that plaintiff can only recover from Joe Harvard individually the profit received on the 6500 shares of Sunnyland that Joe Harvard sold to Soparind.

As the Court has noted, disgorgement extends only to the profit a defendant actually received. *See Pidcock v. Sunnyland*, 854 F.2d at 448. *See also SEC v. Blatt*, 583 F.2d at 1335; *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d at 102; *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d at 1082. The Court would require Joe Harvard individually to disgorge his profits on the Sunnyland transactions, and plaintiff may look to Joe Harvard to satisfy that portion of the judgment.[20]

Defendants argue that because plaintiff's underlying theory of recovery is that the shares owned by Joe Harvard, L.B. Harvard, Jr., Ruth Harvard Salter and Nancy Harvard Jones were actually beneficially owned by L.B. Harvard, Sr. when Sunnyland was sold to Soparind, plaintiff cannot recover from Joe Harvard individually. Considering that pleading in the alternative is permitted under our present procedural rules, and considering Joe Harvard's extensive involvement in the fraud, the stock of the other three Harvard children was held beneficially by Dude Harvard while Joe Harvard held his own shares.[21]

### III. COMPUTATION OF PREJUDGMENT INTEREST

Defendants maintain that the February Order does not identify the correct date

---

**18.** There was no claim that Sunnyland is liable as an "aider and abettor" and conspirator, although such a theory might have been viable in this case. *See generally Rochez II*, 527 F.2d 880, 886–87 (3d Cir.1975) (existence of independent act, knowledge and substantial assistance all necessary to find corporate defendant liable as aider and abettor).

**19.** Plaintiff argues that Joe Harvard aided and abetted the violations of Sunnyland. It would appear that he could also be found liable as an aider and abettor of violations of Dude Harvard.

**20.** Joe Harvard is liable at least for the amount he personally received from the Soparind sale less any consideration he gave his father for

those 6500 shares; however, defendants have created a complicated scenario in which it is difficult to determine precisely where the profits now lie. Joe Harvard also inherited, the Court must assume, a relatively substantial amount through the estate of his father. He is also liable for any profits he inherited from his father's estate, if the estate cannot satisfy its full share of the judgment.

**21.** The Court will not allow the Harvards' continued manipulation to obscure the central facts in this case: the Harvards defrauded Pidcock of his Sunnyland stock and subsequently made a hefty profit on that stock. The Circuit has held that they must disgorge their profit.

from which prejudgment interest should be calculated. The Harvards argue that a new trial is required as to this issue; however, such a trial would be unnecessary in light of the existing record. The Harvards did not receive use of their profits until fall of 1986, and disgorgement is not intended to be punitive. The Court therefore modifies the judgment and fixes October, 1986 as the date from which prejudgment interest should be calculated.

## IV. MOTION FOR CONTINUANCE OF TAXATION OF COSTS

■■■ Defendants have moved for a continuance of taxation of costs pursuant to Rule 54(d) of the Federal Rules of Civil Procedure. Rule 54(d) provides that, barring some contrary statutory provision, costs "shall be allowed as of course to the prevailing party unless the court directs otherwise." Because liability has been established and the only issue remaining is damages, plaintiff has already prevailed, see *Three–Seventy Leasing Corp. v. Ampex Corp.*, 528 F.2d 993 (5th Cir.1976) (plaintiff who establishes liability but no damages is prevailing party for purposes of allowing costs), and is therefore entitled to costs. In its discretion, however, the Court may postpone the awarding of costs until the resolution of the post-trial motions or even the resolution of any appeal. *See Farmer v. Arabian Oil Co.*, 379 U.S. 227, 85 S.Ct. 411, 13 L.Ed.2d 248 (1964).

Plaintiff has not responded to defendants' motion. Although it is likely that plaintiff's bill of costs will eventually have to be addressed by the Court, it would appear to be in the interests of judicial economy to address all matters related to costs at the same time.[22]

## V. MODIFICATION OF JUDGMENT

In summary, in calculating damages under principles of disgorgement, the Court must determine the profits actually received by the Harvards as a result of their defrauding Pidcock of his half share in Sunnyland. The Court has determined that the proper way to determine these profits would be to take the amount of money the Harvards actually received from the subsequent sale of Sunnyland stock, subtract the amount of money the Harvards actually paid for Pidcock's stock and the value of the Harvards' share of Sunnyland at the time of the fraudulent transaction. The resulting figure would be the Harvards' profits resulting from their ownership of all the stock of Sunnyland, including the stock they purchased fraudulently from Pidcock. Because Pidcock was defrauded of half of the stock in the company, he is entitled to half of the Harvards' profits on their full share of Sunnyland.

The Harvards actually received $6,083,-333.32 from the sale of Sunnyland to Soparind. (The remaining $1,216,666.68 of the $7.3 million was paid to the Plan for its portion of the company). From that figure the Court subtracts the amount of money the Harvards actually paid for Pidcock's half share in Sunnyland. The Court has determined that the Harvards paid nothing for Pidcock's stock, and no decrease in the $6,083,333.32 is warranted due to any money received by Pidcock that was paid by Sunnyland and not by the Harvards. The value of the Harvards' half share of Sunnyland at the time of the fraudulent transaction was the same as the value of Pidcock's half share, $2,406,305.00, which must be subtracted from the amount that the Harvards actually received from the sale to Soparind. The Harvards' total profits on the sale of Sunnyland to Soparind were $3,677,028.32, and that figure must be divided in half to determine Pidcock's share of those profits. The Harvards must disgorge $1,838,514.16, their profits on Pidcock's half share in Sunnyland.[23]

---

**22.** Because the parties have indicated that security has been arranged, the Court will not require the posting of security for costs.

**23.** This method of calculation has an equitable effect. The Harvards and Pidcock will each have received $4,244,819.16 for their equal shares of Sunnyland stock. Of course, the Court's goal was to determine the Harvards' profits on Pidcock's half share in Sunnyland, and this is not the same task as bringing the parties into parity. If, as a result of this method of calculation, however, the parties are brought into equivalent positions with respect to the

CONCLUSION

For the foregoing reasons, the Order of February 8, 1989 is hereby MODIFIED and judgment is entered in favor of plaintiff and against defendants in the amount of $1,838,514.16 together with prejudgment interest at the rate of 7% (seven percent) per annum, not compounded, from October 16, 1986. Defendants' motion for continuance of taxation of costs is GRANTED.

SO ORDERED.

amount of money they actually received for their equal portions of Sunnyland stock, so

much the better.